# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROWE INTERNATIONAL CORP. and ARACHNID, INC. | )<br>)<br>)<br>)<br>) |
|        Plaintiffs, | )<br>) |
| vs. | )    Case No. 06 C 2703<br>) |
| ECAST, INC., ROCK-OLA MANUFACTURING CORP., and VIEW INTERACTIVE ENTERTAINMENT CORP., | )<br>)<br>)<br>)<br>) |
|        Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

     Arachnid, Inc. has filed a motion seeking the return of three allegedly privileged documents that it inadvertently produced during discovery. Defendants have filed a cross-motion to compel, claiming that Arachnid waived privilege with regard to the three documents and that the crime-fraud exception abrogates the privilege. Defendants also contend that Arachnid's waiver and fraud allow them to seek the discovery of all otherwise-privileged information regarding the patentability of the patents-in-suit. For the following reasons, the Court grants defendants' motion in part and denies it in part, and grants Arachnid's motion in part and denies it in part.

## Background

     Though the present motions concern only discovery, resolution of the parties' motions

requires a brief familiarity with the lengthy history of the patents-in-suit. Each of the patents-in-suit concerns a computer jukebox or computer jukebox system. Unlike a conventional jukebox, which requires routemen to visit each jukebox location to change records or compact disks and record usage data, a computer jukebox system distributes digital music and retrieves jukebox usage data over a computer network. Arachnid first obtained in 1994 a patent titled "system for managing a plurality of computer jukeboxes" (the '302 patent). The '302 patent identified Arachnid employees John Martin, Michael Tillery, and Samuel Zammuto as the inventors. Jean Kuelper and John Held of McAndrews, Held & Malloy acted as Arachnid's patent counsel. The other patents-in-suit are continuations or continuations-in-part of the '302 patent, and each names Tillery, Martin, and Zammuto as inventors.

During the prosecution of the '302 patent, the Patent and Trademark Office (PTO) examiner raised a prior art objection with regard to a previously issued patent known as Sidi. In summary, the Sidi patent claimed a server that could transmit digital music to various outlets. The PTO examiner contended that Sidi essentially was a computer jukebox and therefore found Arachnid's invention obvious and initially declined to issue a patent. Arachnid's patent attorney, Jean Kuelper, argued in response that certain features of the '302 patent distinguished it from Sidi. She told the examiner that claims 1 through 5 of the application contained "storage space data" that distinguished Arachnid's invention from Sidi. Figure 2 of the '302 patent illustrates the data structure of an individual song record stored in a master library catalog. Arachnid overcame the examiner's objections, and the PTO eventually issued the '302 patent on October 11, 1994.

Rowe International Corp. and Arachnid brought this patent infringement action against

defendants, claiming that they have infringed seven patents held by Arachnid, the '302, '889, '398, '189, '575, '834, and '230 patents. Defendants have counterclaimed, contending that the patents-in-suit are invalid.

On December 11, 2006, Arachnid produced approximately 11,000 documents in electronic form to defendants. Arachnid inadvertently produced three documents that it claims are protected by the attorney-client privilege. These documents, titled "patent reports," concerned the company's inventions. They were prepared in 1997 by an Arachnid employee and were sent to John Held. Among other things, the patent reports attribute to Held certain legal opinions regarding the scope of the Sidi patent. Defendants agree that these documents are privileged, that they were inadvertently produced, and that Arachnid promptly sought their return upon learning of their production. A protective order agreed to by the parties and entered by the Court provides that

> [i]nadvertent production of documents subject to work product immunity or the attorney-client privilege . . . shall not constitute a waiver of the immunity or privilege, provided that the Disclosing Party notifies the Litigant in writing via facsimile, with confirmation by first-class mail, of such inadvertent production immediately upon learning of same. Such inadvertently produced documents, and all copies thereof, shall be returned to the Disclosing Party upon request immediately. Nothing in this Protective Order shall prevent any Litigant from requesting that the Court order the production of any such inadvertently produced documents.

Order of Oct. 25, 2006.

In 1999, Michael Tillery, a former Arachnid employee, was deposed in a prior lawsuit. Tillery was not employed by Arachnid at the time of the deposition, but John Held represented both Tillery and Arachnid at the deposition. At the deposition, Tillery testified as follows regarding certain features of the '302 patent:

3

> Q: Okay. In your conversations with that second attorney, did you provide him with information about song size data?
>
> A: No.
>
> Q: Why do you suppose he included that or she included that?
>
> [Objection; question rephrased].
>
> Q: [] Can you tell us why the information we see in figure 2 was added to the patent application in 1992?
>
> A: I mean, *it is information I learned from our attorneys that – okay, what I – what I was led to believe was the only way we would receive the patent was if we included that information.*
>
> Q: Included more details?
>
> A: More – this particular information about song size and some of the specific things shown right here.

Def. Ex. 4 at 76:8-77:7 (emphasis added). Held did not assert Arachnid's attorney-client privilege nor move to strike the testimony.

In the years after the deposition, Arachnid made no efforts to prevent disclosure of Tillery's testimony. To the contrary, Arachnid provided a copy of Tillery's deposition transcript to the PTO during prosecution of the '575 and '834 patents, which were continuations of the application that became the '302 patent. During the depositions of Held and Kuelper in this case, Arachnid's counsel did not object to questions about Tillery's testimony. Moreover, Arachnid produced the Tillery transcript to defendants in this case. Arachnid does not claim that any of these disclosures were inadvertent.

Based on these facts, defendants contend that Arachnid waived its attorney-client privilege and seek the production of "all privileged communications (including the "patent reports") concerning the patentability of the inventions claimed in the patents-in-suit, the Sidi

4

Patent, communications relating to the preparation and prosecution of the applications of the patents-in-suit, and communications concerning inventorship." Def. Resp. at 15.

Defendants also contend that Arachnid and its attorneys engaged in a fraud on the PTO to secure the '302 patent and the continuation patents. Defendants claim that the fraud took two forms. First, they argue that Held made false statements to the PTO regarding the scope of the Sidi patent. They contend that although Held told the PTO that the Sidi patent was only "superficially similar" to the teachings of the '889 patent, the patent reports show that Held actually believed that Sidi blocked patents for inventions such as computer jukebox systems. Second, defendants argue that the McAndrews firm engaged in "inventorship fraud" by including features in the '302 patent that were not conceived by the named inventors. They claim that the McAndrews firm used an unidentified person knowledgeable in computers to develop the "storage space data" limitations that distinguished their invention from Sidi. As a result of the alleged fraud on the PTO, defendants seek the production of "all privileged documents, including the McAndrews attorneys' work product and the Patent Reports, concerning inventorship, the Sidi Patent, the patentability of the inventions claims in the patents-in-suit, and the preparation and prosecution of the patent applications that led to the patents-in-suit." *Id.*

**Discussion**

Federal Circuit law governs discovery issues in patent cases that concern issues of substantive patent law. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-4 (Fed. Cir. 2000). The question of whether the attorney-client privilege protects materials related to a patent application involves substantive issues of patent law. *Id.* The Court therefore will apply Federal

Circuit law to resolve the parties' motions.

   1.   **Waiver**

The attorney-client privilege protects communications "made by a client to an attorney for the purpose of securing legal advice." *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997). The privilege can, however, can be waived by a "knowing disclosure of privileged documents to a third party." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1350 (Fed. Cir. 2005).

Defendants contend that Arachnid waived its attorney-client privilege when Tillery testified during his 1999 deposition regarding information he "learned from [Arachnid's] attorneys" and Arachnid's attorney, John Held, failed to object. Def. Ex. 4 at 77. They argue that Arachnid also waived the attorney-client privilege when it provided the Tillery deposition transcript to the PTO during the prosecution of the '575 and '834 patents.

Arachnid argues that it has not waived the attorney-client privilege. First, it contends that Tillery's testimony relayed only conclusions and did not disclose the content of privileged communications he had with Arachnid's attorneys. Second, it argues that Tillery's testimony only restated black-letter patent law and that such a statement cannot result in waiver. Finally, it argues that because Tillery did not work for Arachnid at the time of his deposition, his statements could not result in a waiver of Arachnid's privilege.

None of these arguments are availing. First, Tillery's testimony did not merely relay a legal conclusion as Arachnid contends. Rather, counsel's questions and Tillery's answers specifically concerned how figure 2 came to appear in the '302 patent. The testimony, cited above, bears repeating:

> Q: [] Can you tell us why the information we see in figure 2 was added to the patent application in 1992?
>
> A: I mean, *it is information I learned from our attorneys that – okay, what I – what I was led to believe was the only way we would receive the patent was if we included that information.*
>
> Q: Included more details?
>
> A: More – this particular information about song size and some of the specific things shown right here.

Def. Ex. 4 at 76:8-77:7 (emphasis added).

Second, Tillery did not merely recount general propositions of patent law. He stated that he learned about the information in figure 2 of the patent "from [Arachnid's] attorneys." In sum, Tillery's testimony relays specific information he learned from Arachnid's attorneys about details of the '302 patent application and why Arachnid included that information. This is far from a general restatement of patent law.

Tillery did not work for Arachnid at the time of his 1999 deposition. Arachnid is correct that, generally speaking, a deponent cannot waive his former employer's privilege. *See CFTC v. Weintraub*, 471 U.S. 343, 349 (1985) (former executives retain no control over the corporation's attorney-client privilege). In this case, however, John Held represented Arachnid (as well as Tillery) at the deposition. Held did not object or move to strike Tillery's testimony regarding the information he learned from Arachnid's attorneys. Held's failure to object to Tillery's testimony waives Arachnid's privilege. *See United States v. Sanders*, 979 F.2d 87, 92 (7th Cir. 1992); *see also Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 461 (N.D. Cal. 1978) (attorney waives client's privilege when he fails to object to deposition question posed to former employee). Moreover, even if Held's failure to object at the deposition did not waive Arachnid's privilege,

7

Arachnid most certainly waived the privilege when it provided a copy of Tillery's deposition transcript to the PTO. It is hard to imagine a more "knowing disclosure" than making the substance of a privileged communication part of the public record. In sum, Arachnid has waived the attorney-client privilege by knowingly disclosing information Tillery received from Arachnid's attorneys regarding prosecution of the '302 patent.

Having found that Arachnid waived the attorney-client privilege, the Court must determine the scope of the waiver. Federal Circuit law governs the scope of waiver in a patent case. *In re EchoStar Commc'n Corp.*, 448 F.3d 1294, 1298 (Fed. Cir.2006) ("[Q]uestions of privilege and discoverability that arise from assertion of the advice-of-counsel defense necessarily involve issues of substantive patent law."). The "widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all of the communications relating to the same subject matter." *Id.* Yet, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Fort James*, 412 F.3d at 1349-50.

Defendants contend that the "subject matter" of Tillery's testimony includes all communications pertaining to the patentability of the inventions claimed in the patents-in-suit, the Sidi patent, and inventorship. Defendants argue that the scope of the waiver "plainly encompasses the patent reports." Def. Mem. at 10. The scope of waiver proposed by defendants is far too broad. The relevant testimony in Tillery's deposition related solely to the preparation of the '302 patent application in 1992 and, specifically, figure 2 of the patent. The inadvertently produced patent reports were created in 1997 and relate to Arachnid's development of its

commercial jukebox product. After careful review of the patent reports, the Court concludes that they do not relate to the same subject matter as Tillery's testimony. The reports do not reference the '302 patent, figure 2, or information Tillery or the other inventors received from the attorneys prosecuting the patent. Accordingly, Arachnid's waiver via the Tillery deposition does not extend to the patent reports.

Arachnid has, however, waived the attorney-client privilege regarding Tillery and the other named inventors' communications with Arachnid's attorneys regarding the development of figure 2 of the '302 patent, the inclusion of limitations and claims related to "song size" in the '302 patent application, and any communications relating to the decision to include that information in the '302 patent application. On the other hand, the Court rejects defendants' contention that the waiver extends to the other patents in suit, inventorship, and issues of patentability generally. Courts narrowly construe the scope of waiver in patent cases. *Kelsey-Hayes Co. v. Motor Wheel Corp.*, 155 F.R.D. 170, 172 (W.D. Mich. 1991). These matters are not part of the same subject as Tillery's testimony regarding the prosecution of the '302 patent in 1992.

In addition, in determining the scope of a waiver of the attorney-client-privilege, the Court must consider the overriding issue of fairness. *Id.* Though there is no doubt that Arachnid has waived its attorney-client privilege with regard to the subjects described above, expanding the scope of the waiver to include virtually every privileged communication related to all the patents-in-suit would be fundamentally unfair. Such a broad scope would, in essence, wipe out Arachnid's privilege with regard to every communication it had with its patent attorneys over at least a ten-year period, all because of a single brief statement made at a deposition in 1999.

9

Courts often refuse to apply the rules of waiver in a way that would produce such a Draconian result. *See Mendenhall*, 531 F. Supp. at 955 n.8 (refusing to apply broad waiver that would yield "atavistic" and "harsh" results); *Allen-Bradley Co., Inc. v. Autotech Corp.*, No. 86 C 8514, 1989 WL 134500 at *2 (N.D. Ill. Oct. 11, 1989); *Graco Children's Prods., Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*, No. 95 C 1303, 1995 WL 360590 at *8-9 (N.D. Ill. June 14, 1995). As the Court has ruled, Arachnid's waiver is limited in scope to the named inventors' communications with Arachnid's attorneys regarding the development of figure 2 of the '302 patent, the inclusion of limitations and claims related to "song size" in the '302 patent application, and any communications relating to the decision to include that information in the '302 patent application.

### 2.  Crime-fraud exception

"To invoke the crime-fraud exception, a party challenging the attorney-client privilege must make a *prima facie* showing that the communication was made 'in furtherance of' a crime or fraud." *Spalding*, 203 F.3d at 807 (citation omitted). To establish a *prima facie* case of fraud on the PTO, defendants must establish (1) a misrepresentation of material fact; (2) the falsity of that representation; (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent, (4) a justifiable reliance upon the misrepresentation by the PTO; and (5) injury to the PTO. *Id.* The fraud must be based on "independent and clear evidence of deceptive intent" and a "clear showing of detrimental reliance" by the PTO. *Id.*

Held's statements to the PTO upon which defendants base one of their crime-fraud arguments concerned the scope of the Sidi patent. Held told the PTO that "[a]lthough

10

superficially similar," Sidi "is, upon close analysis, fundamentally different from applicant's invention." Def. Ex. 19 at 10-11. Defendants contend that this statement and others like it are fraudulent because the patent reports reveal that Held believed that Sidi blocked patents for inventions such as computer jukebox systems. Held's statements to the PTO do not implicate the crime-fraud exception because he did not misrepresent material facts. Rather, Held's statements constituted legal argument. *See Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1323 (Fed. Cir. 2000) ("[I]n making the argument the inventors merely advocated a particular interpretation of the teachings of the . . . article . . . which the Examiner was free to accept or reject. This argument does not contain any factual assertions that could give rise to a finding of misrepresentation."). Held merely did what an attorney prosecuting a patent commonly does: he attempted to persuade the examiner that the client's invention was novel, was not encompassed within the prior art, and could be patented. He misrepresented no facts in doing so.

Defendants' attempt to broaden the scope of the crime-fraud exception to include statements of this type would have a chilling effect on the essential purpose of the attorney-client privilege: allowing attorneys to provide candid legal advice to their clients. As the Court observed at oral argument, such a broad reading of the crime-fraud exception would, for example, prevent a criminal defense attorney from honestly telling his client that he was sure to be convicted at trial but then arguing to the jury that the government had not proven its case beyond a reasonable doubt. There is no basis in the case law for finding that legal arguments – even if "insincere" in this sense – rise to the level of fraud. *See Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986) ("The mere fact that DuPont attempted to

distinguish the [invention] from the prior art does not constitute a material omission or misrepresentation. The examiner was free to reach his own conclusion regarding the [invention] based on the prior art in front of him."); *Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 451 (S.D.N.Y. 2006) (patentee's statements to the PTO regarding the scope of the prior art do not constitute fraud so as to waive communications with its attorneys). The crime-fraud exception is not triggered by Held's arguments to the PTO.

Defendants also argue that the McAndrews firm and Arachnid engaged in an "inventorship fraud" by identifying inventors on the '302 patent application who had not conceived of certain features disclosed in the specifications and claims and by failing to identify an individual who the McAndrews firm allegedly engaged to provide further details to distinguish Arachnid's invention from Sidi. Defendants point to several pieces of evidence that they claim establish the fraud. During his 1999 deposition, Michael Tillery repeatedly stated that he did not contemplate some of the features of the '302 patent, including the detail in figure 2. John Martin, another named inventor, testified that he did not invent the concepts embodied in figure 2 but believed that Tillery had conceived it. The other named inventor, Samuel Zammuto, testified that he had "nothing to do with" inventing the computer jukebox disclosed in the '302 patent. Def. Ex. 15 at 40. Tillery also testified that he "believed there was someone that was quite computer knowledgeable . . . within [the McAndrews] firm" that provided the information that became figure 2 of the '302 patent. Def. Ex. 4 at 75-7. He was not able to recall the name of this individual nor whether he was an attorney. *Id.* at 76-7.

Arachnid denies that it engaged in any fraud and points to Kuelper and Arachnid president Bill Ward's testimony that all of the information in the '302 patent application came

from Arachnid. Kuelper testified that she received all the information in figure 2 "from the inventors." Pl. Ex. Y at 54. Martin testified that he discussed the computer jukebox invention with others at Arachnid but that it was "difficult to say who contributed what." Pl. Ex. X at 34. Martin also testified that he does not rely on patent attorneys to "fill in things" that he did not tell them about an invention because "their name isn't on the patent." *Id.* at 67.

The named inventors' apparent disavowal of many of the claims in the patents-in-suit is troubling. One would certainly expect that at least one of the three inventors would recall conceiving of the features that Arachnid cited to the PTO as the reason to distinguish its invention from Sidi. It is also troubling that one of the named inventors, Samuel Zammuto, testified that he contributed nothing to the invention that gave rise to the '302 patent.

Though the Court does not specifically decide the issue, it is possible that Arachnid's apparent failure to disclose the true inventors amounts to inequitable conduct. Inequitable conduct "includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000).

Inequitable conduct, however, does not trigger the crime-fraud exception to the attorney-client privilege. *See Spalding*, 203 F.3d at 807. A finding of fraud "requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct . . . [I]t must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission." *Id.*

Defendants have not shown that any of the privileged communications they seek were

13

made "in furtherance" of a crime or fraud. *Id.* The evidence that the McAndrews firm perpetrated a fraud on the PTO, at least on the present record, is thin. None of the named inventors were able to identify the "unidentified male" that defendants contend provided the information in figure 2 of the '302 patent. Tillery's testimony regarding this unknown individual was vague. He equivocated on whether the man was an attorney or even whether he worked at McAndrews. Def. Ex. 4 at 76-9. Moreover, the attorney who prosecuted the patent, Jean Kuelper, testified that she received all of the information in figure 2 from the inventors. Based on the present record, the Court concludes that defendants have not shown that any of Arachnid's communications with the McAndrews firm were made "in furtherance" of a fraud on the PTO. *See generally Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1382 (Fed. Cir. 2000) (rejecting the suggestion that patentee's attorney might be the true inventor because "to assert that proper performance of the attorney's role is a ground for invalidating the patent constitutes a failure to understand the proper role of the patent attorney.").

Defendants also have not made a *prima facie* showing of fraud because they have not cited "independent and clear evidence" of deceptive intent. *Spalding*, 203 F.3d at 807. As Arachnid points out, it had nothing to gain by misnaming the inventors. Defendants counter that Arachnid had to include features in its patent application to distinguish their invention from Sidi. Though true, this does not suggest any reason for Arachnid to misidentify the inventors. Arachnid easily could have named the alleged third-party inventor and remained the patent's assignee. *See Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 541-42 (Fed. Cir. 1990) (no inequitable conduct for failing to name co-inventors where inventor had no motive to lie about inventorship because company would own any issued patent); *Synthelabo v. Apotex, Inc.*, 470

F.3d 1368, 1381 (Fed. Cir. 2006) ("generalized allegations lack the particularity required to meet the threshold level of deceptive intent necessary for a finding of inequitable conduct.").

Moreover, Arachnid provided the Tillery deposition transcript to the PTO during prosecution of the '575 and '834 patents. Arachnid contends that providing the PTO the transcript shows that it could not possibly have had deceptive intent. Defendants argue that the reverse is true, and that providing the transcript is actually evidence of Arachnid's intent to deceive, because the transcript was buried among many other documents Arachnid submitted to the PTO. Though both arguments potentially could be persuasive at trial on the merits regarding inequitable conduct, the crime-fraud exception requires "independent and clear evidence" of deceptive intent. *Spalding*, 203 F.3d at 807. The fact that Arachnid provided a copy of Tillery's testimony to the PTO cuts against such a finding. In sum, defendants have not met their burden of showing a *prima facie* case of fraud.

## Conclusion

As outlined above, the Court grants in part and denies in part Arachnid's motion for protective order [docket no. 70], and grants in part and denies in part defendants' motion to compel [docket no. 81]. The Court orders defendants to return all copies of the inadvertently produced patent reports to Arachnid within two days of entry of this order. Arachnid's counsel's objections to questions in John Held's deposition regarding the patent reports are sustained. Defendants are directed to return all copies of the John Held deposition transcript to Arachnid within two days of entry of this order. Arachnid shall then redact the questions and answers

pertaining to the patent reports and promptly return a redacted copy of the transcript to defendants within two days thereafter.

                                                               _____
                                                                  MATTHEW F. KENNELLY
                                                                  United States District Judge

Date: March 19, 2007