IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROWE INTERNATIONAL CORP. and ARACHNID, INC. )<br>)<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>ECAST, INC., ROCK-OLA )<br>MANUFACTURING CORP., and VIEW )<br>INTERACTIVE ENTERTAINMENT CORP., )<br>)<br>)<br>Defendants. ) | Case No. 06 C 2703 |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Rowe International Corp. and Arachnid, Inc. have filed this patent infringement action against Ecast, Inc., Rock-Ola Manufacturing Corp., and View Interactive Corp., claiming infringement of six patents for computer jukebox and computer jukebox systems. Defendants contend that plaintiffs lack standing to enforce U.S. Patent Nos. 6,598,230, 5,848,398, and 6,970,834, and they have moved to dismiss plaintiffs' claims related to those patents. For the following reasons, the Court denies defendants' motions.

**Background**

Each of the patents at issue in this case concerns a computer jukebox or computer jukebox system. Unlike a conventional jukebox, which requires routemen to visit each jukebox location to change records or compact disks and record usage data, a computer jukebox system

distributes digital music and retrieves jukebox usage data over a computer network. On March 6, 1992, inventors John Martin, Michael Tillery, and Samuel Zammuto filed Patent Application No. 07/846,707 (the '707 application), which disclosed their invention of a system for managing a network of computer jukeboxes. The previous day, the inventors executed an assignment of the '707 application to Arachnid, the company they owned and for which they worked. The assignment stated that

> the undersigned [inventors] hereby assign to Arachnid, Inc. the entire right, title and interest in the invention disclosed in [the '707 patent] application and any and all other applications which Arachnid may file on said invention or improvements and any and all Letters Patent which may be obtained.

Mot. to Dismiss, Ex. A at 4. The '707 application eventually issued as United States Patent No. 5,355,302. The '302 patent identified the inventors as Martin, Tillery, and Zammuto, and the assignee as Arachnid.

In subsequent years, the inventors filed several patent applications derived from the '707 application, including applications that resulted in the issuance of the '398 and '834 patents. The '398 and '834 patents both identify Arachnid as assignee. The applications that became the '398 and '834 patents are both continuations-in-part of the '707 application. Those applications disclose new subject matter, such as downloading, storing, and playing advertisements, that was not part of the '707 application. Defendants contend that because the inventors never executed an additional assignment of their rights in the '398 and '834 patents, the inventors are the owners of those patents, not Arachnid. Therefore, defendants contend, Arachnid and its licensee Rowe do not have standing to assert infringement of the patents.

The '230 patent, issued on July 22, 2003, identifies Karsten Ballhorn as the inventor. In

1999, Ballhorn conveyed his interest in the application that issued as the '230 patent to NSM Music Group Ltd. In July 2005, NSM entered into an agreement with Rowe to license the '230 patent. The license agreement had an initial five-year term and renewed automatically every year thereafter. The agreement granted Rowe "an exclusive right and license" to the '230 patent in the United States for digital jukeboxes and a non-exclusive right to use the technology in Europe. Mot. to Dismiss, Ex. A § 2.1. NSM warranted that "it has not reserved any rights in the ['230 patent], and has not encumbered, licensed, or otherwise obligated itself to license the ['230 patent] to any Third Party . . . ." *Id.* § 2.2. Rowe also received "the exclusive right to enforce the ['230 patent] against any Third Party for past, present, and future infringements . . . ." *Id.* § 6.8. Rowe agreed not to sue NSM with respect to its use of the '230 patent to manufacture or have manufactured by a non-competitor products that incorporate all or part of the '230 patent's technology (NSM products) during the initial five-year term; sell the NSM products prior to or during the term; or operate a service and manage the NSM products itself or through Ecast. *Id.* § 2.9.1. NSM cannot transfer these rights without Rowe's consent. Ecast contends that the license agreement does not convey sufficient rights to Rowe to allow it to enforce the '230 patent.

**Discussion**

Standing is a "threshold question in every federal case, determining the power of the court to entertain suit." *Warth v. Seldin*, 422 U.S. 490, 398 (1975). "A party may bring an action for patent infringement only if it is the 'patentee," *i.e.*, if it owns the patent, either by issuance or by assignment." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1249 (Fed. Cir. 2000). *See also* 35 U.S.C. §§ 100(d), 261, 281. Plaintiffs have the burden of demonstrating their standing to bring suit. *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005). On a

motion to dismiss for lack of standing, the Court is free to weigh the evidence to determine whether jurisdiction has been established. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

### 1. '230 patent

Defendants contend that Rowe and Arachnid lack standing to assert infringement of the '230 patent because NSM retained substantial rights to practice the patent. A licensee such as Rowe may bring suit in its own name only if "all substantial rights under the patent have been transferred . . . rendering the licensee the virtual assignee." *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). To determine whether all substantial rights in a patent have been conveyed, the Court considers both the rights granted and the rights retained. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.p.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991).

Rowe received all the substantial rights under the '230 patent. For example, NSM granted Rowe the "exclusive right and license" to the '230 patent and warranted that it "has not reserved any rights in the ['230 patent.]" Mot. to Dismiss, Ex. A § 2.1, 2.2. Rowe is able to sub-license the '230 patent, without approval from NSM, in exchange for a royalty. *Id.* § 2.6. And, significantly, NSM granted Rowe the "exclusive right to enforce the ['230 patent] against any Third Party for past, present, and future infringements at its own costs . . . ." *Id.* § 6.8. *See Vaupel*, 944 F.2d at 875-76 (grant of right to enforce "is particularly dispositive here because the ultimate question confronting us is whether [licensee] can bring suit on its own or whether [patentee] must be joined as a party."). *See also Speedplay*, 211 F.3d at 1251 (exclusive licensee with right of first refusal to sue for infringement had substantial rights); *Advanced*

4

*Cardiovascular Sys., Inc. v. SciMed Life Sys. Inc.*, 1996 WL 606958, 40 U.S.P.Q.2d 1286, 1290 (N.D. Cal. May 13, 1996) (finding significant that licensee granted exclusive right to initiate "whatever action it deems appropriate to attempt to eliminate [any infringement of the subject patents]."). Courts find the right to sue for infringement particularly important because "[t]he policy underlying when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer . . . . This policy is not undercut here because the right to sue rested solely with [the licensee]." *Vaupel*, 944 F.2d at 875-76.

Despite NSM's assignment of the various rights described above, including the right to sue for infringement, defendants argue that NSM retained significant rights sufficient to preclude Rowe from having standing to enforce the patent. For example, Rowe's license is limited to the field of digital jukeboxes; it must pay a sublicense royalty to NSM; Rowe may not take infringement action against Ecast before January 1, 2006; and NSM retains development rights to improvements that "directly evolve" from the '230 patent. Mot. to Dismiss, Ex. A §§ 2.3, 2.4, 2.6, 2.9.

These rights, however, are not so significant that they preclude Rowe from enforcing the patent. As the court noted in *Advanced Cardiovascular*, "[w]hen [the patentee] transferred exclusive rights to the entirety of the patents to [the licensee], [the licensee] obtained the power to license any portion of its newly acquired patent rights. At the same time, [the patentee] lost [its] title to the patents and [its] right to sue for patent infringement." *Advanced Cardiovascular*, 1996 WL 606958, 40 U.S.P.Q.2d at 1290-91. The arrangement between Rowe and NSM is similar to that between the parties in *Advanced Cardiovascular*. Essentially, after receiving an exclusive license, Rowe granted certain rights back to NSM via the covenant not to sue. The

covenant not to sue, therefore, further illustrates that Rowe received substantial patent rights; it could not grant back rights it did not have. *See id.* at 1290 ("the 1988 License Agreement clearly demonstrates that [the patentee] first transferred all exclusive rights to the patents to [licensee], and that subsequently [licensee] granted [patentee] limited patent rights within the [specified] field . . . .").

Ecast argues that despite the Federal Circuit's holding in *Vaupel*, "an unbroken line of controlling authority dating back more than eighty years . . . holds that a party cannot create standing merely by transferring the right to sue." Reply Brief at 1. Ecast's argument is a classic strawman. There is no doubt that a party does not have standing to sue if it acquires only a contractual right to enforce a patent. *See Propat Int'l Corp. v. RPOST, Inc.*, 473 F.3d 1187, 1192 (Fed. Cir. 2007). That, however, is not the case here. As described above, Rowe received much more than the right to sue infringers. Among other things, Rowe received an exclusive license; it can sublicense the patent without NSM's consent; and NSM disclaimed any rights in the patent. Mot. to Dismiss, Ex. A § 2.1, 2.2, 2.6. Coupled with those substantial rights, the right to sue infringers is "particularly dispositive." *Vaupel*, 944 F.3d at 875. The Court therefore denies Ecast's motion to dismiss plaintiffs' claim related to the '230 patent.

### 2. '398 and '834 patents

Defendants contend that Rowe and Arachnid lack standing to assert infringement of the '398 and '834 patents because neither plaintiff owned the patents at the time the suit was filed. Rather, they argue, the patents were still owned by the listed inventors, because the inventors' 1992 assignment of the '707 application applied only to what became the '302 patent. They contend that the '398 and '834 patents, which were based on continuations-in-part of the '707

6

application, include improvements that were not part of the 1992 assignment.

The inventors filed a *nunc pro tunc* assignment of the '398 and '834 patents on October 23, 2006. Defendants are correct that an assignment of patent rights after a lawsuit is filed does not confer standing on plaintiffs. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996) ("parties should possess rights before seeking to have them vindicated in court . . . . Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue."). Therefore, the Court looks to the 1992 assignment to determine whether plaintiffs have standing.

Though Federal Circuit law governs the patent issues before the Court, state law governs interpretation of the assignment contract. *See Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996). Under Illinois law, the Court looks to the language of the assignment to ascertain the intentions of the parties unless an ambiguity exists. *LaSalle Nat'l Trust v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996) ("the court must give effect to the intention of the parties at the time of the agreement"); *see also Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288, 565 N.E.2d 990, 994 (1990) ("If no ambiguity exists in the writing, the parties' intent must be derived by the trial court from the writing itself, as a matter of law."). An ambiguity exists if the contract is reasonably susceptible to more than one meaning. *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill.App.3d 605, 863 N.E.2d 743, 759 (2007).

In this case, the Court must interpret the provision in which the inventors assigned to Arachnid the '707 application and

> any and all other applications, both United States and foreign, which the

> undersigned may file, either solely or jointly with others, on said invention or improvements, and in any and all Letters Patent of the United States and foreign countries, which may be obtained on any of said applications, and in any reissue or extension of such patents . . . .

Mot. to Dismiss, Ex. A.

The Court concludes that this provision of the parties' assignment is unambiguous. The assignment included the invention disclosed in the '707 application "or improvements" to the application, along with "any and all other applications" the inventors "may file . . . on said invention or improvements." *Id.* Defendants contend that the reference to "improvements" includes only improvements in existence at the time of the assignment and that to assign the later-issued '398 and '834 patents, the agreement would have had to specify an assignment of "future improvements" or "continuations-in-part." The plain language of the contract, however, shows otherwise. The assignment specifically contemplated that improvements would be made to the invention in the future and that "other applications" could be filed.

An improvement is "an alteration or addition to an existing subject of invention or discovery that does not destroy its identity or essential character but accomplishes greater efficiency or economy: a modification improving and making more valuable an existing discovery or invention." Webster's Third New International Dictionary 1138 (1993). The continuation-in-part applications that became the '398 and '834 patents are, by definition, improvements. For this reason, the fact that the assignment does not use the magic words "continuation-in-part" is of no consequence. *See Regents of the Univ. of N.M. v. Knight*, 321 F.3d 1111, 1119 (Fed. Cir. 2003) (assignment included continuations-in-part because of broad language of agreement even though agreement did not refer to continuations-in-part). *See also*

8

*E.I du Pont de Nemours & Co. v. Okuley*, No. C2-97-1205, 2000 WL 1911430, at *26 (S.D. Ohio Dec. 21, 2000) ("[a]n assignment which conveys the entire right, title, and interest in an invention includes 'all alterations and improvements and all patents whatsoever, issues and extensions alike, to the extent of the territory specified in the instrument.' The CIP applications at issue are simply extensions of the original patent application filed in this case.'") (citation omitted).

Even were the Court to find the contract language ambiguous, the extrinsic evidence shows that the parties contemplated that the 1992 assignment included continuation-in-part patents such as the '398 and '834 patents. First, the parties executed the assignment within a day of the inventors' filing of the '707 application. As plaintiffs point out, any existing improvements to the invention then existing would have been disclosed in the '707 application. This reflects that the parties had to have used the word "improvements" to refer to those the inventors would develop in the future. Second, the inventors have averred that they intended to assign all their rights in improvements to the invention disclosed in the '707 application. Reply Mem., Ex. B at ¶ 6 ("[a]t the time the 1992 Assignment was executed, I intended to assign and understood that I was assigning to Arachnid all improvements, whenever made, to the underlying computer jukebox invention disclosed in the '707 Application, and was assigning and did assign to Arachnid any future applications or patents which incorporated any such improvements."). Finally, Arachnid prosecuted the '398 and '834 patents, which identify Tillery, Martin, and Zammuto as the inventors and Arachnid as the assignee. The inventors never took any action to indicate that they objected – further evidence that they intended the 1992 assignment to include the improvements covered by the '398 and '834 patents.

**Conclusion**

For the foregoing reasons, the Court denies defendants' motions to dismiss [docket nos. 94 and 95].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 14, 2007