# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ROWE INTERNATIONAL CORP. and ARACHNID, INC., | Case No.: 1:06-cv-02703 |
| Plaintiffs/Counterdefendants, | Judge Kennelly Magistrate Judge Cole |
| v. | |
| ECAST, INC., ROCK-OLA MANUFACTURING CORP., and VIEW INTERACTIVE ENTERTAINMENT CORP., | PUBLIC RECORD VERSION |
| Defendants/Counterclaimants. | |
| ECAST, INC. Counterclaimant, | |
| v. | |
| AMI ENTERTAINMENT, INC Counterdefendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS ROWE INTERNATIONAL CORP.'S AND ARACHNID, INC.'S AND COUNTERDEFENDANT AMI ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION.................................................................................... 1

II. STATEMENT OF UNDISPUTED FACTS........................................... 3

III. ARGUMENT......................................................................................... 4

    A. STANDARDS FOR SUMMARY JUDGMENT .............................. 4

    B. ECAST-POWERED JUKEBOXES INFRINGE CLAIMS 1-6 OF THE '189 PATENT............................................................................... 5

        1.  The Uncontested Factual Basis That Ecast-Powered Jukeboxes Infringe Claims 1-6 Of The '189 Patent........................................... 5

        2.  The Defendants' "Efficient Storage" Argument Should Be Rejected............ 9

    C. THE ECAST NETWORK AND ECAST-POWERED JUKEBOXES INFRINGE CLAIMS 1-6, 9-11, 15 AND 21-25 OF THE '575 PATENT...................... 10

        1.  The Uncontested Factual Basis That The Ecast Network And Ecast-Powered Jukeboxes Infringe Claims 1-6, 9-11, 15 And 21-25 Of The '575 Patent.............. 11

        2.  Defendants Make No Arguments Against Infringement Of Claims 22-25 Of The '575 Patent ......................................................... 15

        3.  Defendants' "Efficient Storage" Argument Should Be Rejected ...................... 15

        4.  Defendants Do Not Avoid Infringement By Contending That Akamai Is Not Part Of The Central Management Station ................................. 16

    D. DEFENDANTS' INEQUITABLE CONDUCT CLAIMS IN CONNECTION WITH THE ARACHNID PATENTS SHOULD BE DISMISSED......................... 17

        1.  Law Of Inequitable Conduct ..................................................... 18

        2.  The Rejections During Prosecution Of The '302 Patent ................................ 20

        3.  The '173 And '379 Reissue Application Rejections .......................... 21

        4.  The Rejections During Prosecution Of The '400 Patent Application ............... 23

        5.  The Zammuto Declarations .................................................... 25

        6.  The '350 Patent And Its Foreign Counterparts ................................ 26

        7.  The Alleged Leonard Jukebox And The '181 Patent ......................... 27

i

8. Mr. Held's Arguments During Prosecution Of The '889 Patent........................ 28

9. Inventorship............................................................................................ 29

E. CLAIMS 17 AND 19-21 OF THE '350 PATENT ARE INVALID........................... 32

IV. CONCLUSION ........................................................................................... 35

DOCSNY-295674v01

## TABLE OF AUTHORITIES

Page

**Cases**

*Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380 (Fed. Cir. 1998)..........22

*Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986)........................29

*Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570 (Fed. Cir. 1995)........................19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................5

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998)............................................20

*Blackhawk Molding Co. v. Portola Pkg., Inc.*, 422 F. Supp. 2d 948 (N.D. Ill. 2006)...................29

*Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418 (Fed. Cir. 1988)................................2, 17

*Celeritas Techs, Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354 (Fed. Cir. 1998)............................33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................5

*Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309 (Fed. Cir. 2006) ...........................19

*Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263 (Fed. Cir. 2004).........................5

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352 (Fed. Cir. 2004)........................................30

*General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978 (Fed. Cir. 1997)........................5

*Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158 (Fed. Cir. 2004) ........................................20

*Hebert v. Lisle Corp.*, 99 F.3d 1109 (Fed. Cir. 1996)..................................................19

*Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006) ............................30

*Impax Labs., Inc. v. Aventis Pharms. Inc.*, 468 F.3d 1366 (Fed. Cir. 2006)..................................18

*In the Matter of Sabec*, 137 B.R. 659 (Bkrtcy. W.D Mich. 1992)..................................32

*In re Hiniker Co.*, 150 F.3d 1362 (Fed. Cir. 1998) ........................................30

*Innogenetics N.V. v. Abbott Labs.*, 2008 U.S. App. LEXIS 976 ........................................29

*Jamesbury Corp. v. United States*, 518 F.2d 1384 (Ct. Cl. 1975) ................................32

*Kingsdown Med. Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed. Cir. 1988)....................19

iii

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347 (Fed. Cir. 2001)................19

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335 (Fed. Cir. 2006) 18, 19, 27

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) .......................................10

*Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 348 (D. Del. 2004) .............................................................................................................................4, 5

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001) ........................19

*Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538 (Fed. Cir. 1990) .........................................25

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995)........................................................17

*Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394 (Fed. Cir. 1996) ....................................................27

*Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931 (Fed. Cir. 1990)..........................19, 25

*Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568 (Fed. Cir. 1996) ...........19, 30

*Q-Pharma, Inc. v. Andrews Jergens Co.*, 360 F.3d 1295 (Fed. Cir. 2004) .....................................4

*Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559,1574-75 (Fed. Cir. 1997) .................23

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) ........................................19, 31

*Solomon v. Kimberly-Clark,* 216 F.3d 1372 (Fed. Cir. 2000) ......................................................32

**Statutes**

35 U.S.C. § 103(a) .......................................................................................................................33

35 U.S.C. § 112...........................................................................................................................34

35 U.S.C. § 251...........................................................................................................................21

Regulations

37 C.F.R. § 1.56(b) ................................................................................................................19, 25

Rules

Fed. R. Civ. P. 30(b)(6).............................................................................................................16

Fed. R. Civ. P. 56.......................................................................................................................19

DOCSNY-295674v01

## I.     INTRODUCTION

This litigation currently involves six patents, each relating to computer jukeboxes or computer jukebox networks. Rowe International Corp. ("Rowe") and Arachnid, Inc. ("Arachnid") (together, "Plaintiffs") claim that Ecast, Inc. ("Ecast"), Rock-ola Manufacturing Corp. ("Rock-ola") and View Interactive Entertainment Corp. ("View") (together, "Defendants") infringe asserted claims of U.S. Patent Nos. 6,397,189 ("the '189 patent"), 6,381,575 ("the '575 patent"), 5,848,398 ("the '398 patent") and 6,970,834 ("the '834 patent") (together, "the Arachnid patents").[1] Rowe also claim that Ecast, Rock-ola and View infringe asserted claims of U.S. Patent No. 6,598,230 ("the '230 patent"). Ecast has counterclaimed against Rowe and AMI Entertainment, Inc. ("AMI") for infringement of U.S. Patent No. 5,341,350 ("the '350 patent").[2]

This motion seeks summary judgment on three aspects of the case. First, Plaintiffs seek summary judgment of infringement on the asserted claims of the '189 and '575 patents. As explained in more detail below, Plaintiffs presented, through their expert, a detailed demonstration of how Defendants infringe claims 1-6 of the '189 patent and claims 1-6, 9-11, 15 and 21-25 of the '575 patents (as well as the other asserted claims).[3] In response, Defendants did not dispute *any* of the factual evidence presented by Plaintiffs. Instead, Defendants, through their expert, presented two new claim construction arguments. The first, asserted in connection with claims 1-6 of the '189 patent and claims 1-6, 15 and 21 of the '575 patent, ignores the plain meaning of the claims, and instead tries to add an "efficient storage" requirement by relying upon claim language from a *different* patent (the '302 patent) *that is not recited* in the claims of the '189 and '575 patents. Defendants' second claim construction argument, asserted in connection with claims 9-11, 15 and 21 of the '575, is irrelevant to this motion. As we show

---

[1] Plaintiffs originally claimed infringement by Defendants of two additional patents: U.S. Patents No. 5,355,302 ("the '302 patent") and 5,781,889 ("the '889 patent"). Plaintiffs are no longer pursuing these claims.

[2] The '189, '575, '398, '834, '230, '302 and '889 patents are attached as Exs. 1-7, respectively, to Plaintiffs' Statement of Material Facts ("PSMF"). Citations to "Ex.__" in this brief refer to the Exhibits attached to Plaintiffs' Statement of Material Facts submitted contemporaneously with this Memorandum of Law.

[3] This evidence was presented in the expert report of Dr. Bradley W. Dickinson, dated September 4, 2007. The relevant portions of Dr. Dickinson's report and the evidence upon which he relied are attached as Exs. 8, 9, 11-15 and 17-26 to Plaintiffs' Statement of Material Facts.

below, even if Ecast's claim interpretation were correct, the undisputed facts still demonstrate that these claims are infringed.

Second, Plaintiffs seek summary judgment dismissing Defendants' inequitable conduct defenses. The Federal Circuit has noted that inequitable conduct allegations have become a "plague" in which defendants feel compelled to make a knee jerk claim that the patentee or its attorneys acted so improperly that its patents should be rendered unenforceable. *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988). This case is no different. Defendants, after copiously scouring a prosecution history record, including 17 separate patent application files comprising thousands of pages and spanning 15 years, have raised a series of occurrences where the prosecution may not have been perfect and then try to weave a web of unfairness and deceit. At best, Defendants have uncovered a handful of mistakes in a long and arduous patent prosecution. But all of Defendants' efforts suffer from the same fundamental and fatal flaw: they do not have a shred of evidence of intent to deceive by the inventors or the prosecuting attorneys, let alone the *clear and convincing* evidence of intent to deceive required to make a showing of inequitable conduct.

Finally, Defendants move for summary judgment on the '350 patent asserted as a counterclaim by Ecast against Rowe and AMI. Ecast is currently asserting claims 17, 19, 20 and 21 of the '350 patent. Pursuant to the Court's schedule, Rowe and AMI presented its expert testimony demonstrating why three pieces of prior art rendered these claims invalid for anticipation and/or obviousness. *Ecast consciously and deliberately chose not to submit expert testimony in response.* Accordingly, the factual record establishing invalidity stands unrebutted. Indeed, it is unfathomable that Ecast is continuing to pursue these claims.

Ecast's action is particularly outrageous with respect to claim 20. The afternoon before this motion was due, Ecast indicated that it intends to pursue a claim for infringement of claim 20.[4] [PSMF ¶ 22 (Ex. 34).] Not only had Ecast failed to submit expert testimony in response to Rowe's and AMI's invalidity evidence, *Ecast never bothered to submit expert testimony of infringement of this claim when it was due last September.* In light of its decision not to contest Rowe's and AMI's invalidity evidence and its last minute addition of a claim for which it did not even submit expert evidence of infringement, Ecast has no excuse for continuing

---

[4]Citations to "Ex.___" in this Memorandum refer to the Exhibits attached to Plaintiffs' Statement of Material Facts ("PSMF") submitted contemporaneously with this Memorandum.

DOCSNY-295674v01

to pursue these claims for infringement of the '350 patent and should be required to reimburse Rowe and AMI for the costs and attorneys fees expended on this aspect of this summary judgment motion.[5]

## II.     STATEMENT OF UNDISPUTED FACTS

Ecast operates the Ecast network, which includes a media distribution system as well as Ecast-powered jukeboxes connected to the system. [PSMF ¶ 5 (Ex. 8 at E009106).]



Ecast does not manufacture the actual Ecast-powered jukeboxes.

---

[5] Ecast's actions stand in stark contrast to those of plaintiffs Rowe and Arachnid. In light of the Court's claim construction, Plaintiffs determined not to go forward on their previous claims for infringement of the '302 and '889 patents, subject only to the right to appeal this Court's claim construction should that become necessary. Plaintiffs informed Ecast of its decision before the filing of the first expert reports. Ex. 3. Ecast did not return the courtesy. But even worse, at this late juncture, it is insisting that Rowe and AMI be put to the time and expense of filing this motion when it knows that it decided not to contest Rowe's and AMI's evidence of invalidity.

[6] There is no dispute that Ecast's data center in Sunnyvale, CA is a part of its central facility. [PSMF ¶ 5 (Ex. 8 at E009110).] Plaintiffs contend (and Ecast disagrees) that the central facility is broader, including other aspects of the Ecast system which provide central management services to the Ecast-powered jukeboxes. However, there is no need for the Court to resolve that dispute in this motion.



3



█████████████████████ Rather, the jukeboxes have been manufactured by Rock-ola, View, NSM Music Group Ltd. ("NSM") and previously, Rowe. [PSMF ¶ 6 (Ex. 9 at 57).] Ecast-powered jukeboxes also include jukeboxes upgraded by conversion kits manufactured by Rock-ola, View and NSM, by which older CD jukeboxes are converted to computer jukeboxes. [PSMF ¶ 6 (Ex. 9 at 129-34).] ███████████████

## III. ARGUMENT

### A. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Q-Pharma, Inc. v. Andrews Jergens Co.*, 360 F.3d 1295, 1299-1300 (Fed. Cir. 2004). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.*

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *Matsushita*

DOCSNY-295674v01

*Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 348, 357 (D. Del. 2004) (citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party fails to make a sufficient showing of an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd.*, 299 F. Supp. 2d at 357 (citing to *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). In other words, the court must grant summary judgment if the party responding to the motion fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Matsushita Elec. Indus. Co., Ltd.*, 299 F. Supp. 2d at 357.

**B.     ECAST-POWERED JUKEBOXES INFRINGE CLAIMS 1-6 OF THE '189 PATENT**

The September 4, 2007 expert report by Dr. Bradley W. Dickinson asserted the Plaintiffs' evidentiary and factual bases that Ecast-powered jukeboxes infringe claims 1-6 of the '189 patent. [PSMF ¶¶ 10, 11 (Ex. 16 at 60-68).] On October 19, 2007, the Defendants submitted a report by their expert, Dr. Sigurd Meldal, in response to the Dickinson infringement report. In the Meldal report, the Defendants do not contest or dispute any of the facts presented by Dr. Dickinson in relation to the '189 patent.[8] [PSMF ¶¶ 10, 11 (Ex. 17 at 12-14).] Instead, the Defendants *sole* argument regarding non-infringement of claims 1-6 of the '189 patent is, as explained below, a meritless claim interpretation issue relating to a single claim limitation. *Id.*

**1.     The Uncontested Factual Basis That Ecast-Powered Jukeboxes Infringe Claims 1-6 Of The '189 Patent**

To establish infringement, the Plaintiffs must show that the accused product has each and every limitation of the asserted claim either literally or by the doctrine of equivalents. *See, e.g., Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). When material facts pertaining to the operation of an accused device are undisputed, the issue of infringement is particularly susceptible to summary judgment, because infringement is then a pure question of law. *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir.

---

[8] Defendants also provided responses to contention interrogatories requesting Defendants to provide all of the reasons supporting their claim of non-infringement of, *inter alia*, claims 1-6 of the '189 patent. However, Defendants' response provides no analysis and cites to no evidence to support Defendants' contentions of non-infringement. [PSMF ¶¶ 10, 11 (Ex. 15 at response 9).]

DOCSNY-295674v01

1997). Explained below is the undisputed evidence establishing infringement of claims 1-6 of the '189 patent summarized from Dr. Dickinson's report.

### a. The '189 patent, independent claim 1

| Claim Limitation | Undisputed evidence of infringement. |
|---|---|
| An improved computer jukebox for playing songs selected by users of the computer jukebox from a library of songs that have been digitally compressed and stored in the computer jukebox, where the library of songs stored in the computer jukebox is capable of being updated upon the receipt of compressed digital song data, which represents at least one song, and upon the receipt of song identity data, which represents the identity of each such song, the computer jukebox comprising: | Ecast-powered jukeboxes each playback songs as they are selected by a user. [PSMF ¶ 10 (Ex. 9 at 612; Ex. 15 at responses 3, 5 and 8).] |
| a communication interface for receiving the compressed digital song data and the song identity data; | |
| a data storage unit for storing the received compressed digital song data and the received song identity data for each of the songs stored; | |
| a display adopted for showing, to prospective user of the computer jukebox, user attract data and information that identifies the songs for which digital song data is stored in the data storage unit and that is based on song identity data; | The Ecast-powered jukeboxes each include a touch screen display that allows a user to view songs stored on the jukebox hard drive by, e.g., song title. |
| selection keys responsive to a selection of a song to be played on the computer jukebox from the song identity information displayed on the display, the selection keys including a signal output representing activation of the selection keys; | |

6

| | |
|---|---|
| at least one audio speaker; | |
| a processor connected to a memory, the memory including a decompression algorithm for decompressing compressed digital song data; | |
| a digital to analog converter coupled between the processor and the audio speaker to convert digital song data to an analog signal coupled to the speaker; and | |
| wherein the memory further includes instructions for: | |
| causing the processor to have the display show at least one of user attract data and information that identifies the songs for which digital song data is stored in the data storage; | |
| causing the processor, in response to the signal output, to access and process compressed digital song data retrieved from the data storage unit so that the accessed compressed digital song data corresponds to the song selected by the selection keys; | |
| causing the processor to decompress the accessed compressed digital song data and send the decompressed digital song data to the digital to analog converter so that the song selected is played on the computer jukebox as a result of the corresponding stored compressed song digital data being decompressed and converted by the processor and the digital to analog converter; and | |

7



| causing the processor to respond to compressed digital song data and to song identity data, which may be received by the communication interface of the computer jukebox, **to control the storage of the received** compressed digital **song data** and the received song identity data in the data storage unit to create an updated library of songs stored in the computer jukebox.[9] | |

### b. The '189 patent, dependent claims 2-6

Claims 2-6 are claims which each depend from claim 1. That means that the dependent claims include all the limitations of independent claim 1 plus additional limitations.

Claim 2 recites that the memory further include instructions for the display of songs using the updated song library and for the storage and transmission of song usage information. These limitations are met by the Ecast-powered jukeboxes because



Claims 3 and 4 recite that the data storage unit stores received song associated compressed pictorial graphics, and that the memory includes instructions for the processor "to generate a user attract mode wherein song associated graphic images are shown on the display" when no song is being played. These limitations are met when



---

[9] As explained below, the bolded portion is the only limitation that Defendants even attempt to dispute.

DOCSNY-295674v01

Claims 5 and 6 recite that the jukebox includes a modem, that compressed song identity data is received and stored at the jukebox, and that the jukebox displays are at least 14 diagonal inches. Ecast-powered jukeboxes include 14 diagonal inch displays



### 2. The Defendants' "Efficient Storage" Argument Should Be Rejected

The only claim limitation that Defendants attempt to dispute is the requirement that the Ecast-powered jukeboxes include "instructions for causing the processor ... to control the storage of ... song data," as recited in independent claim 1 (and incorporated in dependent claims 2-6) of the '189 patent. [PSMF ¶¶ 10, 11 (Ex. 17 at 12-14).] But even here, Defendants do not dispute that the Ecast processor controls storage of song data. Rather, Defendants present a new claim construction argument that this claim limitation should be construed contrary to the limitation's ordinary and customary meaning to require that a jukebox control the storage of the downloaded data such that the jukeboxes efficiently store the downloaded song and identity data based on song size. Neither the term "efficient storage" nor "song size" appear in the claim. Defendants, however, argue that their proffered construction is required by the prosecution history of the '302 patent, a different patent which, unlike the '189 patent, *does* include a specific limitation that the processor store songs based on storage space data.

During prosecution of the '302 patent, the applicants explained that the receipt and use of "storage space data," as recited in the claims of the '302 patent, distinguished the '302 claims from a prior art reference (the "Sidi" reference). [PSMF ¶ 12 (Ex. 24 at ROWE-0001181-82).] The applicants explained that the claim limitation "processing means being responsive to digital song data, song identity data and *storage space data* received by said communication interface to control the storage of said digital song data to update said jukebox" differentiated the '302 patent from Sidi. "[T]he use of 'storage space data' as claimed in claim 1-5 allows the processing means ... to perform memory management functions when new songs are added to

DOCSNY-295674v01

the computer memory, thereby optimizing the available storage space in the memory."[10] *Id.* (emphasis added). In other words, the '302 claims were allowable over Sidi because, among other things, they recited the receipt and use of "storage space data" (e.g., song size).

Using the '302 prosecution history and the Court's comments regarding the '302 claims in its March 2007 Claim Construction Order, Defendants attempt to impose the limitations of the '302 patent onto a different patent, the '189 patent, and *onto claims that do not recite the same limitations as the '302 claims.* [PSMF ¶¶ 10, 11 (Ex. 17 at 3-5, 12-14).] Defendants' argument is unavailing. The '189 claims never recite that "storage space data" is received or used in controlling the storage of songs, as recited in the '302 patent. Nor do the '189 claims require the efficient storage of songs. Rather, the '189 patent simply requires that the processor "control the storage of ... song data."[11] Defendants' argument fails because the '189 claims do not recite the foundational "storage space data" language that lends support to Defendants' interpretation; Defendant's interpretation is based on different claim language in a different patent.

Claim construction is an issue of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995). Plaintiffs request that this Court construe this claim term requiring the processor to "control the storage of ... song data" according to its ordinary and customary meaning. Since there are no disputed facts, under this ordinary meaning, that a processor in the Ecast-powered jukeboxes controls the storage of song data, summary judgment of infringement should be entered on claims 1-6 of the '189 patent.

### C. THE ECAST NETWORK AND ECAST-POWERED JUKEBOXES INFRINGE CLAIMS 1-6, 9-11, 15 AND 21-25 OF THE '575 PATENT

Dr. Dickinson's September 4, 2007 report asserted the evidential and factual bases that the Ecast-powered jukeboxes and Ecast network infringe claims 1-6, 9-11, 15 and 21-25 of the '575 patent. [PSMF ¶¶ 13-20 (Ex. 16 at 39-60).] In Dr. Meldal's responsive report, Defendants, once again, *do not contest or dispute any of the material facts presented by Dr. Dickinson.* [PSMF ¶¶ 13-20 (Ex. 17 at 21-23).] Defendants offer no argument, whatsoever,

---

[10] While the applicants could have distinguished Sidi on other grounds, the "storage space data" argument was the argument submitted to the U.S. Patent and Trademark Office.

[11] The '189 patent claims also recite a multitude of additional elements and limitations that distinguish the '189 claims from both Sidi and the claims of the '302 patent.

DOCSNY-295674v01

against infringement of claims 22-25. Regarding the other asserted claims, Defendants proffer two claim construction arguments, neither of which defeats this motion. First, Ecast reasserts its "efficient storage" argument (for claims 1-6, 15 and 21) which is equally incorrect for the '575 patent as it is for the '189 patent. [PSMF ¶¶ 13-20 (Ex. 17 at 21-22).] Ecast's second claim construction argument (which applies only to claims 9-11, 15 and 21) is that the claimed "central management station" only includes the Ecast Sunnyvale facility and does not include Ecast's use of Akamai facilities, which serve as alternative servers from which to download music to Ecast-powered jukeboxes. [PSMF ¶¶ 13-20 (Ex. 17 at 22-23).] Ecast's second claim construction argument need not be decided on this motion because it is undisputed that the Sunnyvale facility alone performs each and every function required by claims 9-11, 15 and 21 of the '575 patent.

**1.    The Uncontested Factual Basis That The Ecast Network And Ecast-Powered Jukeboxes Infringe Claims 1-6, 9-11, 15 And 21-25 Of The '575 Patent**

Explained below is the undisputed evidence establishing infringement of claims 1-6, 9-11, 15 and 21-25 of the '575 patent as summarized in Dr. Dickinson's report.

**a.    The '575 patent, independent claim 1**

| Claim Limitation | Undisputed evidence of infringement. |
|---|---|
| A computer jukebox for playing songs transferred to and stored in the computer jukebox, the computer jukebox comprising: | |
| at least one communication interface for receiving digitized song data and for receiving an associated song record, the song record including song identity data comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count; | |
| a memory storing the digitized song data and the song identity data; | |
| a display adapted for presenting song selections based on the song identity data and a user attract mode; | |

11



| | |
|---|---|
| a song selector for determining from the song selections a selected digitized song to be played on the computer jukebox; | |
| at least one audio speaker; | |
| a processor operative to present on the display at least one of a user attract mode and song selections based on song identity data, and operative to retrieve digitized song data corresponding to the selected digitized song, and operative to store the digitized song data and the song identity data received by the at least one communication interface in the memory; and | |
| a digital to analog converter coupled between the processor and the audio speaker to convert the digitized song data to an analog signal for the audio speaker. | |

**b.     The '575 patent, claims 2-6 (dependent from claim 1)**

Claim 2 recites that the memory of claim 1 stores the digitized song data in a library and the song identity data in a catalog.  The Ecast-powered jukeboxes store a library of songs ████████████████████████████████████████ Claims 3 and 4 (which depend from claim 1) recite that the jukebox display presents song selections alphabetically by "at least two of song genre, song artist and song title," and presents graphics associated with the songs by a graphics address.  The Ecast-powered jukeboxes present songs alphabetically by all three of these methods, and present album cover art with the song selections.  [PSMF ¶ 14 (Ex. 9 at 626-27, 644-47; Ex. 13 at 158-84; Ex. 7 at E040808; Ex. 25 at E040416).]  Claim 5 (which depends from claim 2, and thus, also from claim 1) recites the ability to scroll through song selections on the display, a feature that all Ecast-powered jukeboxes include.  [PSMF ¶ 14 (Ex. 9 at 644-47; Ex. 25 at E040416; Ex. 13 at 158-84).]  Claim

12

6 recites that the jukebox of claim 4 (which depends from claim 1) includes a user attract mode to display the song-associated graphics identified by the graphics address when no song is being played.



c. **The '575 patent, independent claim 9**

| Claim Limitation | Undisputed evidence of infringement. |
|---|---|
| A central management system for distributing digitized songs to a computer jukebox, the central management system comprising: | |
| at least one communication interface adapted for transmitting user attract data, for transmitting digitized song data and for transmitting an associated song record, the song record including song identity data comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count; | |
| a memory storing digitized song data and song identity data and adapted for storing user attract data; and | |
| a processor operative to retrieve selected digitized song data and transmit the selected digitized song data to a computer jukebox through the at least one communication interface, the processor further operative to retrieve song identity data associated with the selected digitized song data, build an associated song record using the song identity data, and transmit the associated song record to the computer jukebox through the at least one communication interface. | |



d. **The '575 patent, claims 10 and 11 (dependent from claim 9)**

13

Claim 10 recites that the memory of claim 9 stores digitized song data in a song library and song identity data in a song catalog. 

**e.    The '575 patent, independent claim 15 and dependent claim 21**

Claim 15 is essentially a combination of claims 1 and 9 of the '575 patent, and does not include any elements or limitations not already addressed above with respect to claims 1 and 9, and thus, is met by the Ecast system for the reasons described above in connection with claims 1 and 9. *See supra* at pp. 11, 13. Similarly, claim 21, which depends from claim 15, adds the same limitations of claim 4 of the '575 patent and thus is met by the Ecast system as described above with regards to claim 4. *See supra* at p. 12.

**f.    The '575 patent, independent claim 22**

| Claim Limitation | Undisputed evidence of infringement. |
|---|---|
| A method for receiving and playing songs using a computer jukebox, the method comprising: | |
| receiving at the computer jukebox digitized song data and an associated song record, the song record including song identity data comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count; | |
| storing the digitized song data and the song identity data in a memory in the computer jukebox; | |
| presenting at least one of a user attract mode | |

14

| | |
|---|---|
| and song selections based on the song identity data on a display; |  |
| determining from the song selections a selected digitized song to be played on the computer jukebox based on input from a song selector; | |
| retrieving digitized song data corresponding to the selected digitized song; | |
| converting the digitized song data to an analog signal; and | |
| applying the analog signal to an audio speaker. | |

### g. The '575 patent, claims 23-25 (dependent from claim 22)

Claims 23-25 depend from claim 22 and add the same limitations as claims 2-4 of the '575 patent, respectively. The Ecast-powered jukeboxes, therefore, meet these recited limitations for the same reasons described above in relation to claims 2-4. *See supra* at 12.

### 2. Defendants Make No Arguments Against Infringement Of Claims 22-25 Of The '575 Patent

Ecast has failed to provide any non-infringement arguments with respect to claims 22-25 of the '575 patent. [PSMF ¶¶ 19, 20 (Ex. 17 at 21-23).] Therefore, the undisputed facts conclusively show that these claims are infringed.

### 3. Defendants' "Efficient Storage" Argument Should Be Rejected

Defendants assert that their "efficient storage" argument applied to claims of the '189 patent is also applicable to claims 1-6, 15 and 21 of the '575 patent. [PSMF ¶¶ 13, 14, 17, 18 (Ex. 17 at 21-23).] Once again, Defendants do not dispute any of the factual evidence showing infringement of these claims. Instead, as Defendants did in the '189 patent, Defendants argue that the limitation "a processor ... operative to store the digitized song data and the song identity

15

data," as recited in independent claims 1 and 15 (and incorporated in dependent claims 2-6 and 21) of the '575 patent, should be construed to require that a jukebox "control the storage of the downloaded data such that the jukeboxes efficiently store the downloaded song and identity data based on song size." *Id.* As with the '189 claims, the '575 claims neither recite the term "storage space data" nor "efficient storage," but only require that there be "a processor operative ... to store digitized song data." For all the reasons discussed above (*supra* at 9-10), Defendants' claim construction argument should be rejected. Since there is no dispute of fact under the ordinary meaning of this claim limitation, this limitation is met by Ecast-powered jukeboxes. Accordingly, the Court should enter summary judgment that claims 1-6, 15 and 21 are infringed.

### 4. Defendants Do Not Avoid Infringement By Contending That Akamai Is Not Part Of The Central Management Station

There is no dispute that Ecast's Sunnyvale facility can be considered a part of a "central management system" as described in independent claims 9 and 15 (and asserted dependent claims 10-11 and 21). [PSMF ¶¶ 15-18 (Ex. 8 at E009110).]

The Court, however, need not decide this dispute to find infringement of these claims because the undisputed facts demonstrate,

Ecast's red herring argument, even if accurate,

---

[12] While unnecessary to this motion, Ecast's argument about "central management system" is without merit.

[13] In addition to downloading songs and song identity data, the claims also require that the central management station store and retrieve the song data and song identity data, and build a song record using

does not create a genuine dispute of material fact because undisputed facts show that the Sunnyvale facility performs each of the required functions of the claimed central management station. Accordingly, this Court should grant summary judgment of that claims 9-11, 15 and 21 and infringed.

### D. DEFENDANTS' INEQUITABLE CONDUCT CLAIMS IN CONNECTION WITH THE ARACHNID PATENTS SHOULD BE DISMISSED

As so often occurs in patent litigation, Defendants have felt compelled to assert a laundry list of accusations that Arachnid and/or its attorneys committed inequitable conduct. Defendants' unfounded accusations are exactly the kind of overzealous charges of inequitable conduct that the Federal Circuit has called an "absolute plague."

> *[The] habit of charging inequitable conduct in almost every major patent case has become an absolute plague.* Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account. They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself.

*Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (emphasis added); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed. Cir. 1995) ([U]njustified accusations of inequitable conduct are *offensive* and *unprofessional*. . . . [and] deprive patentees of their earned property rights and impugn fellow professionals. *They should be condemned*) (emphasis added).

The prosecution history of the Arachnid patents covers seventeen separate applications, leading to eight patents and consisting of thousands of pages. Defendants have nitpicked the prosecution histories to allege the following, and often legally improper, theories of inequitable conduct attributed to Arachnid and/or its attorneys:

- Not disclosing to the examiners of the '889, '189, and '575 patents the rejections made during prosecution of the '302 patent;

---

the song identity data. [PSMF ¶¶ 15, 17 (Ex. 2 at claims 9 and 15).]

- Not disclosing to the examiners of the '889, '189, and '575 patents the rejections made during prosecution of the '173 and '379 reissue applications;

- Not disclosing and/or mischaracterizing the rejections made during prosecution of the '400 application to the examiner of the '189 and '575 patents;

- Filing declarations with the United States Patent and Trademark Office ("USPTO") wherein Arachnid employee Samuel Zammuto stated that he was an inventor of the Arachnid patents-in-suit;

- Not disclosing U.S. Pat. No. 5,341,350 (the "'350 patent") and its foreign counterparts to the USPTO during prosecution of the '889 and '398 patents;

- Not disclosing Michael Leonard's alleged digital jukebox and related materials during prosecution of the '302, '889 and '398 patents;

- By "misrepresenting" U.S. Pat. No. 4,956,768 (the "Sidi patent") to the examiner of the '889 patent;

- By representing to the USPTO that John Martin and Michael Tillery are inventors of the Arachnid patents-in-suit; and

- By not naming as an inventor on the Arachnid Patents an unidentified inventor who allegedly conceived of features of computer jukeboxes shown in Figures 2 through 5 of the '302 Patent.

[*See* PSMF ¶ 30 (Ex. 37 at 21-38; Ex. 38 at 28-43; Ex. 39 at ¶¶ 100-06).] The time has come to remove these meritless accusations. As shown below, Defendants have no clear and convincing evidence that anyone intended to deceive the USPTO. And in many instances, Defendants fail to offer appropriate evidence that allegedly withheld information is even material.

## 1.    Law Of Inequitable Conduct

"To prove that a patent is unenforceable due to inequitable conduct, [Defendants] must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information and (2) an intent to deceive." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 468 F.3d 1366, 1374 (Fed. Cir. 2006). Defendants must also show by clear and convincing evidence that a specific person (with a duty to the USPTO) knew of the undisclosed information and knew or should have known of its materiality. *See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1341 (Fed. Cir. 2006).

18

The duty to submit information to the USPTO applies only to material information. If information is not material to the subject matter of the patent application, there is no duty to disclose that information. *See* 37 C.F.R. § 1.56(b); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 940 (Fed. Cir. 1990) ("Absent materiality, inequitable conduct for failure to disclose can not lie.").[14] A piece of prior art is *not material as a matter of law* if it is less relevant than, *i.e.*, is cumulative of, other items of prior art that were before the USPTO. *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed. Cir. 2001); *Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1577 (Fed. Cir. 1996).

"Intent to deceive cannot be inferred solely from the fact that information was not disclosed; *there must be a factual basis for a finding of deceptive intent.*" *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (emphasis added); *see also M. Eagles Tool Warehouse*, 439 F.3d at 1340. Even evidence of gross negligence in nondisclosure, by itself, is not enough to constitute inequitable conduct. *See Hebert*, 99 F.3d at 1116; *Kingsdown Med. Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (*en banc* in relevant part). "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Id.*; *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995).

Finally, materiality and intent must be proven separately by clear and convincing evidence. *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) ("[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct.") (citation omitted); *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1360-61 (Fed. Cir. 2001) (affirming finding of materiality, but no intent to deceive concerning failure to disclose a piece of prior art cited against a foreign counterpart application).

---

[14] "Material" information is information that is not cumulative to information already of record or being made of record in the application, and (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) it refutes, or is inconsistent with, a position the applicant takes in: (i) opposing an argument of unpatentability relied on by the Office, or (ii) asserting an argument of patentability. 37 CFR § 1.56(b); *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006) ("[I]f a misstatement or omission is material under the new *Rule 56* standard, it is material. Similarly, if a misstatement or omission is material under the "reasonable examiner" standard or under the older three tests, it is also material.").

## 2.    The Rejections During Prosecution Of The '302 Patent

The first patent to issue to Arachnid was the '302 Patent, which issued in 1994.[15] During the prosecution of the application that led to the '302 Patent (the '707 application), the claims as initially filed were rejected. [PSMF ¶ 31 (Ex. 6).] The claims were amended, and then allowed as amended. [PSMF ¶ 32 (Ex. 24 at ROWE 0001178-87; Ex. 42 at ARACH 007704-16; Ex. 43 at ARACH007744-45] Defendants allege that "Applicants and their attorneys" committed inequitable conduct because they knew of the rejection, but failed to disclose the substance of the rejection during the prosecution of the '889, '189, and '575 Patents applications. According to Defendants, the rejections were material to the subsequent Arachnid '889, '189 and '575 patents because they related to claims that were substantially similar to the claims being asserted in those subsequent patent applications. [PSMF ¶ 30 (Ex. 37 at 21-26; Ex. 38 at 28-33).] This argument fails as a matter of law both because there was no intent to deceive and because the '707 application rejection was not material information. [PSMF ¶¶ 33, 34, 35 (Ex. 37 at 22-28; Ex. 38 at 28-33).]

Defendants can not identify *any evidence* that Arachnid or its attorneys intended to deceive the USPTO with respect to the '707 application rejection. Although they deposed six Arachnid attorneys, Defendants never asked a single one of them why the '707 rejection was not specifically submitted in later Arachnid applications. [PSMF ¶ 35.] This complete lack of evidence eliminates any possibility of establishing intent to deceive, particularly as the *only* evidence of record eliminates any possible inference of intent to deceive.

Each of the '889, '189 and '575 Patents expressly claims priority back to the '302 patent. [PSMF ¶ 36 (Ex. 44 at 2 (ARACH 007821-007835)); Ex. 45 at ARACH 008020-008021; Ex. 46 at ARACH 008188-008190)] As such, the '707 application is a "parent" or "grandparent" application of each of the '889, '189 and '575 Patents [*Id.*; PSMF ¶ 43 (Ex. 54 at 86, col. 2).] and deemed to be a part of the file history of each of those applications, *see Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004) (parent application is "part of" file history of patent). It simply cannot be inequitable conduct, as a matter of law, not to cite to an examiner that which is already a part of the prosecution history. *See ATD Corp. v. Lydall,*

---

[15] Attached as Exhibit 47 to Plaintiffs' Statement of Material Facts (filed herewith) is a chart showing the various Arachnid Patents and applications and how they inter-relate.

*Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) ("In view of § 609 it can not be inequitable conduct for an applicant not to resubmit, in the divisional application, the information that was cited or submitted in the parent application."); *see also* Patent and Trademark Office, Department of Commerce, Manual of Patent Examining Procedure § 609 (6th ed., rev. 1 1995) ("The examiner will consider information cited or submitted to the Office in a parent application when examining a . . . continuation . . . application . . . .") There cannot be an intent to deceive where the Arachnid attorneys made specific reference to the '302 patent during prosecution of each of the '889, '189 and '575 patents. [PSMF ¶ 36 (Ex. 44 at 2 (ARACH 007821-007835)); Ex. 45 at ARACH 008020-008021; Ex. 46 at ARACH 008188-008190); PSMF ¶ 44 (Ex. 55 at 4-6).][16]

### 3. The '173 And '379 Reissue Application Rejections

Patentees are entitled to seek reissuance of an issued patent, pursuant to 35 U.S.C. § 251, if a patent is believed to be "defective" for any reason. Arachnid filed two such "reissue" applications ("the 173 application" and "the 379 application") seeking to reissue the '302 Patent. [PSMF ¶ 37 (Ex. 48 at ARACH 020879-020894; Ex. 49 at ARACH 020870-020872).] In both reissue applications, the examiner issued substantially identical rejections of the claims. [PSMF ¶¶ 38, 47 (Ex. 37 at 25; Ex. 38 at 31; Ex. 59 at 72; Ex. 50 at ARACH 020947-020963; Ex. 51 at ARACH 020847-020857).] Both reissue applications were ultimately abandoned by Arachnid, and the '302 Patent was not reissued. [PSMF ¶ 38 (Ex. 52 at ARACH 020946; Ex. 53 at ARACH 020846).]

Defendants allege that "Applicants and their attorneys" committed inequitable conduct by failing to disclose the substance of the reissue rejections during the prosecution of the '889, '189, and '575 Patents. Defendants claim that the rejections were material to the prosecution of those patents because the rejected reissue claims were substantially similar to the claims of the '889, '189 and '575 patents. [PSMF ¶ 30 (Ex. 37 at 21-26; Ex. 38 at 28-33).] This argument fails as a matter of law both because there is no evidence of any intent to deceive and

---

[16] Moreover, Defendants cannot show that the '707 rejection is material to the subject matter claimed in the subsequent '889, '575, and '189 Patents. To prove materiality, Defendants must show, among other things, that the information in the '707 rejection is more pertinent to what was already before the examiners in those subsequent patent applications, *i.e.*, "not cumulative." Defendants have not even attempted to make such a showing in any of their answers to interrogatories or their expert reports.

because the reissue rejections were not material information as to those subsequent patent applications.

Defendants can not identify *any evidence* that Arachnid or its attorneys intended to deceive the USPTO with respect to the reissue rejections. [PSMF ¶ 39.] Defendants deposed six Arachnid attorneys and never asked any of them why the rejections in the reissue applications were not disclosed. [PSMF ¶ 50.] Once again, without clear and convincing evidence of an intent to deceive, no finding of inequitable conduct is possible.

The *only* evidence of record eliminates any possible inference of any intent to deceive. During prosecution of the '889, '189, and '575 patents, Arachnid disclosed to the USPTO copies of a Protest filed (by a third party) during prosecution of the '173 reissue application. [PSMF ¶¶ 40 (Ex. 60 at ARACH 007839-007842; Ex. 61 at ARACH 008006-008008; Ex. 62 at ARACH 021505-021509).] The Protest identified the '173 reissue application as well as the rejections made in the that application. [PSMF ¶ 40 (Ex. 60 at ARACH 007840-42).] The submitted Protest specifically explains that the reissue examiner, in rejecting the reissue application, had *"asserted several examples of prior art and the reasons why the broadened claims should not be allowable."* [*Id.* (emphasis added).] Accordingly, the disclosure of the Protest, which specifically informed the subsequent examiners both about the '173 reissue application and the rejections, refutes any possible allegation that Arachnid's attorneys were intending to deceive the examiners of the subsequent '889, '189 or '575 patents applications. *Cf. Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) (reversing finding of inequitable conduct because the district court failed to give weight to evidence contrary to intent to deceive and the patentee "hardly could be seeking to deceive the PTO as to the existence of copending applications when it actually disclosed the fact of copendency to the . . . examiner [of the later-filed application]"). Even Defendants' own legal expert, Kenneth Burchfiel, testified that he was not providing an opinion whether disclosure of the Protest was sufficient to provide notice to the examiner. [PSMF ¶ 41 (Ex. 65 at 220-21).] In light of this uncontroverted record, Defendants have no facts that can be used to establish intent to deceive by clear and convincing evidence.[17]

---

[17] There is no evidence that the reissue rejections were material information that needed to be submitted during the prosecution of the '889, '575 and '189 applications, that is, that the reissue rejections were "more pertinent" than the information already of record in these prosecution history files. [PSMF ¶¶ 42,

### 4. The Rejections During Prosecution Of The '400 Patent Application

In an allegation that is extremely difficult to follow and, at least currently, is not properly in the case,[18] Defendants appear to be alleging that Arachnid and its attorneys committed inequitable conduct by failing to disclose to the examiner of the '189 and '575 patents (Examiner Hewitt), the obviousness rejections made during prosecution of the '400 application ("'400 rejections") by a different examiner (Examiner Sough). [PSMF ¶ 30 (Ex. 39 at 27-28).] According to Defendants, the '400 rejections were material to the prosecution of the '189 and '575 patent applications because the claims of the '400 application and the '189 patent application were "similar in substance." [*Id.*] Defendants further allege that Arachnid mislead the '189 and '575 Examiner about the status of the '400 application. This allegation also fails as a matter of law.

### a. There was no intent to deceive

---

45 (Ex. 37 at 22-28; Ex. 38 at 28-33; Ex. 42 at ARACH 007704-15; Ex. 50 at ARACH 020947-63; Ex. 56 at 525-53; Ex. 57¶ 168).] Defendants' effort to establish materiality through the expert testimony of Sigurd Meldal is an utter failure. Dr. Meldal first opines that the reissue rejections are more pertinent than the rejection from the '302 application because the reissue rejections explicitly rejected the claims on the same grounds that had been implicitly stated in the '302 rejection. [PSMF ¶ 46 (Ex. 58 at ¶ 20).] That is just another way of saying that the two rejections are essentially the same. Obviously, the reissue rejections are merely cumulative of the '302 rejection. *See Regents of Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1574-75 (Fed. Cir. 1997) (finding a reference cumulative when it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO").

Second, Dr. Meldal asserts that one of the reissue rejections is more pertinent than the '302 rejection because it makes reference to another prior art reference, namely the William patent application, GB2193420A. [PSMF ¶ 48 (Ex. 58 at ¶¶ 22-24).] That argument fails to establish materiality. A review of the reissue rejection undisputably shows that the reissue examiner, while mentioning William, *never rejected the claims by applying the William reference.* [PSMF ¶ 48 (Ex. 51 at 11; Ex. 58 at ¶¶ 22-24).] Accordingly, the reissue rejection simply provides nothing that the subsequent examiner would need to see. Nor could the rejection become material because it makes reference to William. The undisputed record shows that Arachnid itself provided William to the USPTO during prosecution of the '889, '575 and '189 patent application. [PSMF ¶ 49 (Ex. 60 at ARACH 007839-007842; Ex. 61 at ARACH 008006-008008; Ex. 62 at ARACH 021505-021509; Ex. 63 at ARACH 008387-008391).] To state the obvious, the mere identification of William in the reissue rejection cannot be "more pertinent" than the William reference itself.

[18] These allegations appear only in Defendants' *proposed* Second Amended Answer. [PSMF ¶ 30 (Ex. 39 at ¶¶ 100-06).] Plaintiffs indicated that they would consent to the filing of this amendment although they believe there is not sufficient evidence to support the allegations. To date, Defendants have not submitted the amendment to the Court. Plaintiffs address the allegations here because they believe they have no merit whatsoever, and seek to eliminate all such allegations from this case.

23

Defendants can not identify *any evidence* that Arachnid or its attorneys intended to deceive the USPTO with respect to the '400 rejections. [PSMF ¶ 51.] Once again, Defendants never asked any of the six deposed Arachnid attorneys any substantive question about this allegation. [PSMF ¶ 51.] Without clear and convincing evidence of deceptive intent, there can be no inequitable conduct.

The *only* evidence of record cuts against any inference of intent to deceive. As Defendants expressly admit in their proposed Second Amended Answer, Arachnid's attorney faxed a letter to Examiner Hewitt (the examiner of the '189 and '575 patent) on June 21, 2001, referencing to a telephone discussion he had with Hewitt that day wherein they expressly discussed the '400 application. The fax included a copy of the pending claims of the '400 application. [PSMF ¶ 53 (Ex. 66 at ARACH 008047-48).] In that same letter, the Arachnid attorney made specific reference to the rejection in the '400 application, and asked that either Examiner Hewitt or Examiner Sough (the Examiner of the '400 application) contact him to discuss the rejection issued in the '400 application. [*Id.*] Thus, by these actions, Arachnid's attorney explicitly made the '189 and '575 Examiner aware of the '400 application, specifically made him aware of the rejection in the '400 application and suggested a course of action which encouraged Examiner Hewitt to review the '400 rejection. These actions completely refute the allegation that the Arachnid attorney was trying to conceal the rejection of the '400 application or the substance of that rejection from the '189 and '575 examiner.[19] Plainly, there is no clear and convincing evidence of intent to deceive the USPTO.

### b. The rejections were not material

Defendants have also not demonstrated how the rejections of the claims of the '400 application were material to the subject matter claimed in the '575 and '189 Patents. [PSMF ¶ 52 (Ex. 39 at 27-28).] Defendants have made no effort to show that the rejections of the '400 application are not cumulative of the information already before the examiner during prosecution

---

[19] It makes no sense for Mr. Held to have attempted to deceive the examiner of the '575 and '189 patents (Hewitt) in light of the facts that he and the examiner of the '400 application (Sough) were both working in the same art unit, Art Unit 2161 [PSMF ¶ 54 (Ex. 67 at 1 (ARACH 021261-021275); Ex. 68 at 1 (ARACH 008029-008040); Ex. 69 at 1 (ARACH 008198-008212)], at the USPTO, and that Examiner James Trammell was the Supervisory Patent Examiner on each of the '400 application, the '189 patent application, and the '575 patent application. [PSMF ¶ 54 (Ex. 67 at 10 (ARACH 021261-75; Ex. 68 at 8 (ARACH 008029-40; Ex. 69 at 8-9 (ARACH 008198-212).]

of the '575 and '189 patents; no attempt to establish a *prima facie* case of unpatentability of the '575 and '189 patents based on the '400 rejections, or how those rejections refute, or are inconsistent with, a position Arachnid took with respect to patentability during prosecution of the '575 and '189 patents. *See* 37 C.F.R. § 1.56(b) (defining materiality). [PSMF ¶ 52 (Ex. 39 at 27-28).] Because there is no evidence of materiality of the '400 application rejection, there can be no inequitable conduct. *See Northern Telecom*, 908 F. 2d at 940.

### 5. The Zammuto Declarations

Defendants allege that Arachnid and its attorneys committed inequitable conduct by knowingly filing false inventor declarations with the USPTO naming Samuel Zammuto as an inventor on several of the Arachnid Patents. [PSMF ¶ 30 (Ex. 37 at 28-31; Ex. 38 at 33-35).] Defendants base this allegation on Mr. Zammuto's testimony in a 1999 deposition in a prior case captioned *Arachnid, Inc. v. TouchTunes, Inc., et al.*, No. 98 C 3765 (N.D. Ill.), at which Mr. Zammuto testified (years after the fact) that he believed that he did not invent any subject matter in the Arachnid patents.[20] *Id.* Defendants also allege that Arachnid attorney Joseph Butscher "compounded" this alleged inequitable conduct by subsequently submitting to the USPTO Petitions To Correct Inventorship. According to Defendants, Mr. Butscher committed inequitable conduct because he did not directly speak with Mr. Zammuto about his intent prior to submitting the Petitions, which state that the erroneous naming of Mr. Zammuto as an inventor of the Arachnid patents-in-suit arose "without any deceptive intention on the part of said inventor.". [PSMF ¶ 30 (Ex. 37 at 30; Ex. 38 at 35).]

Once again, there is no evidence of any intent to deceive the USPTO. [PSMF ¶ 55.] In fact, it would be nonsensical for there to be an intent to deceive. Mr. Zammuto was (and remains) an Arachnid employee, who, like the other inventors, was obligated to assign any inventions to Arachnid. [PSMF ¶ 56 (Ex. 72).] Whether there were two employee inventors (Martin and Tillery) or three employee inventors (Martin, Tillery and Zammuto) would not and does not have any legal significance whatsoever. Whether Mr. Zammuto is named or not named on the Arachnid Patents, the USPTO would have issued, and Arachnid would have received, the patents. *[Id.]* Thus, there is no motive, or any reason whatsoever, for anyone to have deceptively named Mr. Zammuto as an inventor. *See Modine Mfg. Co. v. Allen Group, Inc.*, 917

---

[20] The Defendants chose not to depose Mr. Zammuto in this case.

F.2d 538, 541-42 (Fed. Cir. 1990) (Federal Circuit upheld a district court's finding of no inequitable conduct for failure to name co-inventors where inventor had no motive to intentionally lie about inventorship, because the company would own any issued patent).[21] There is no intent to deceive, and no inequitable conduct, either by Mr. Zammuto's execution of inventor declarations or the attorneys filing of those declarations.[22]

Finally, Defendants' bootstrap allegation that Mr. Butscher somehow "compounded" the inequitable conduct because he filed Petitions to correct inventorship (which included Mr. Zammuto's declaration that he was named as an inventor by error without deceptive intent) without first speaking with Mr. Zammuto is makeweight. Mr. Butscher, of course, was entitled to rely on Mr. Zammuto's own sworn statement (in the Petitions for Correction) that he had no deceptive intent as well as to rely upon the statement of Arachnid attorney John Held that Mr. Zammuto was erroneously listed as an inventor without any deceptive intention. [PSMF ¶ 58 (Ex. 75 at 161-62).] Moreover, there is no evidence that there is anything in the filing that is untrue. After all, as explained above, there is no evidence that Mr. Zammuto signed the original declarations of inventorship with any intent to deceive the USPTO.

### 6. The '350 Patent And Its Foreign Counterparts

Defendants also allege that Arachnid committed inequitable conduct by failing to disclose to the USPTO the '350 patent and its foreign counterparts DE4021707 and WO92/01342 during the prosecution of the '889 and '398 patent applications. [PSMF ¶ 30 (Ex. 37 at 31-34; Ex. 38 at 36-39).] According to Defendants, these references constitute prior art that Arachnid inventors and/or Arachnid attorneys knew was material and which was intentionally withheld from the USPTO during prosecution of the '889 or '398 patent applications. Like Defendants' other allegations, this one also fails because Defendants have

---

[21] While not germane to the disposition of this motion, there is evidence from Arachnid explaining why Mr. Zammuto was named as an inventor on the Arachnid Patents. [PSFM ¶ 55 (Ex. 71 at 35-36, 39-40; Ex. 77 at 37-38; Ex. 78 at 21-22, 152-153.]

[22] Additional evidence further supports the conclusion that there cannot be inequitable conduct. Arachnid submitted Mr. Zammuto's 1999 deposition testimony during prosecution of the '575 and '834 patents, and removed Mr. Zammuto as a named inventor during the prosecution of the '575 patent. [PSMF ¶ 57 (Ex. 2; Ex. 62 at 3 (ARACH 021505-021509); Ex. 63 at ARACH 008387-008391; Ex. 70 at ARACH 008194-008197; Ex. 71).] These are not the acts of a party trying to conceal inventorship from the USPTO, but rather, the acts of a party simply trying to correct the record.

DOCSNY-295674v01

identified no evidence that Arachnid or its attorneys had any intent to deceive. [PSMF ¶ 61 (Ex. 37 at 31-34; Ex. 38 at 36-39).] To the contrary, the undisputed facts show that Arachnid, after actually learning of the existence of this material, disclosed it to the USPTO during prosecution of the '575, '189, and '834 patents.[23] [PSMF ¶ 66 (Exs. 63, 68-69).] Such actions destroy any possible inference of an intent to deceive.

Defendants also have not offered any evidence that anyone at Arachnid, or its attorneys, knew or should have known of the alleged materiality of the '350 patent or its foreign counterparts before the 1998 issuance of the '889 and '398 patents. [PSMF ¶¶ 30, 60, 62 (Ex. 37 at 31-34; Ex. 38 at 36-39; Ex. 71 at 113-14, 130; Ex. 77 at 217-23, 319-20).][24] The only evidence that Defendants have asserted to create an inference of knowledge is that a printout of "a summary of the '350 patent . . . dated June 24, 1997 . . . [that] was produced from the files of Arachnid or the files of [its attorneys]" in the *Touchtunes* case. [PSMF ¶ 60 (Ex. 59 at 169-70).] This is not clear and convincing evidence sufficient to prove that someone with a duty of disclosure knew or should have known of the materiality of the '350 patent because it does not establish that any specific person with a duty of disclosure knew about the patent or recognized its materiality. *See Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 396-97 (Fed. Cir. 1996) (copy of prior art found in patent holder's files without evidence that those with a duty of disclosure were actually aware of it held insufficient to establish actual knowledge). Indeed, even Defendants expert, Kenneth Burchfiel, concedes that he does not know who ordered or looked at the '350 patent prosecution history. [PSMF ¶ 60 (Ex. 65 at 343).]

### 7. The Alleged Leonard Jukebox And The '181 Patent

An independent third party, Michael Leonard, allegedly conceived some sort of computer jukebox and built prototype(s) in the late 1980's or early 1990's; although no alleged prototypes have been produced in this action. [PSMF ¶ 59 (Ex. 76 at 24, 47).] Defendants allege that Arachnid committed inequitable conduct by failing to disclose to the USPTO information about Michael Leonard's alleged digital jukebox (and the related disclosure in a patent

---

[23] The '575, '189, and '834 patents all ultimately issued over the '350 patent. [PSMF ¶ 66 (Exs. 1-2, 4).]

[24] As explained above, there must be a showing by clear and convincing evidence that a specific person with a duty to the USPTO knew or should have know of the materiality of the withheld reference. *See, e.g., M. Eagles Tool Warehouse*, 439 F.3d at 1341.

DOCSNY-295674v01

application which resulted in U.S. Patent No. 5,388,181 ("the '181 Patent"))[25] during prosecution of the '302, '889 and '398 patents. [PMSF ¶ 30 (Ex. 37 at 31-34; Ex. 38 at 36-39).] According to Defendants, Arachnid's then-President Bill Ward[26] knew of this information and withheld it from the USPTO with deceptive intent. [PSMF ¶ 30 (Ex. 37 at 32-34).]

Defendants cannot offer any credible evidence that Mr. Ward (or anyone with a duty of disclosure) had any specific knowledge of Mr. Leonard's jukebox or that he had any intent to deceive the USPTO. [PSMF ¶ 61 (Ex. 37 at 31-34; Ex. 38 at 36-39).] To the contrary, Mr. Ward testified that he recalled having at least one telephone conversation with Mr. Leonard, but that he could not recall ever seeing Mr. Leonard's alleged jukebox, the parent patent application U.S. Pat. Ser. No. 07/530,547 filed on May 29, 1990 to which the '181 patent claims priority, or the '181 patent itself. [PSMF ¶ 64 (Ex. 78 at 103-15; 139).] Mr. Ward also testified that it was his understanding that the Arachnid patents-in-suit had an earlier priority date than the '181 patent. [PSMF ¶ 64 (Ex. 78 at 116-20; Ex. 79).]

Finally, the fact that Arachnid, after actually learning of the existence of the Leonard information, disclosed Mr. Leonard's publications as well as the '181 patent to the USPTO during prosecution of the '575, '189, and '834 patents once again destroys any inference of an intent to deceive the USPTO at any time regarding that same information.[27] [PSMF ¶ 66 (Exs. 63, 68-69.] There is simply no clear and convincing evidence to support a charge of inequitable conduct.

### 8. Mr. Held's Arguments During Prosecution Of The '889 Patent

Defendants allege that Arachnid attorney John Held committed inequitable conduct by "misrepresenting the import of the Sidi reference and mischaracterizing its contents" during prosecution of the '889 patent. [PSMF ¶ 30 (Ex. 37 at 34-35; Ex. 38 at 39).]

---

[25]Defendants have not offered any evidence that Arachnid ever possessed a copy of the '181 patent application while the '302, '889, and '398 patents were pending. [PSMF ¶ 65.]

[26]Although Defendants recite their boilerplate allegation that "Applicants and their attorneys" failed to disclose the Leonard information, the only person identified by Defendants as even possibly having knowledge at relevant times of Mr. Leonard's jukebox is Mr. Ward. [PSMF ¶ 63 (Ex. 37 at 32-34).]

[27] The '575, '189, and '834 patents all ultimately issued over the Leonard jukebox, and the '181 patent. [PSMF ¶ 66 (Exs. 1-2, 4).]

28

Defendants' assertion is legally baseless. Even if Defendants could show that Mr. Held somehow mischaracterized the Sidi reference (which they cannot), there still could not be inequitable conduct because the examiner had the Sidi reference before him when he examined the '889 patent. [PSMF ¶ 67 (Ex. 80 at 6-8).] It is well-established that an attorney's arguments about a cited reference to the USPTO during prosecution cannot, as a matter of law, constitute material misrepresentations to support a charge of inequitable conduct. *See Innogenetics N.V. v. Abbott Labs.*, 2008 U.S. App. LEXIS 976, at *37 (granting sanctions to a patentee because of similar allegations by a defendant); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986); *Blackhawk Molding Co. v. Portola Pkg., Inc.*, 422 F. Supp. 2d 948, 964 (N.D. Ill. 2006). This Court has already acknowledged as much in a previous Order when it observed that "Held merely did what an attorney prosecuting a patent commonly does: he attempted to persuade the examiner that the client's invention was novel, was not encompassed within the prior art, and could be patented. He misrepresented no facts in doing so." [PSMF ¶ 67 (Ex. 84 at 11).]

### 9. Inventorship

Defendants next allege that Mr. Martin and Mr. Tillery are not inventors of the subject matter claimed in the Arachnid patents-in-suit, and, therefore, Arachnid and its attorneys committed inequitable conduct "by asserting" that Mr. Martin and Mr. Tillery invented the subject matter claimed in the those patents. [PSMF ¶ 30 (Ex. 37 at 35-38; Ex. 38 at 40-43).] Defendants also have asserted that an unnamed mystery inventor, whom they have stated they suspect to be former Arachnid attorney James Bennett, invented some of the subject matter of the Arachnid patents-in-suit and should have been named as an inventor on the patents. [PSMF ¶ 30 (Ex. 40 at 1-3).] Defendants base these allegations on snippets of testimony taken out of context from the depositions of Mr. Martin and Mr. Tillery in the *TouchTunes* case. These assertions, too, fail as a matter of law.

### a. Martin and Tillery were properly named as inventors

Even assuming every allegation about inventorship Defendants make is true, it cannot be inequitable conduct to have named Mr. Martin and Mr. Tillery as inventors of the Arachnid patents-in-suit, because Defendants do not (and cannot) dispute that Martin and Tillery conceived of at least some of the subject matter claimed in the Arachnid patents-in-suit. [PSMF

29

¶ 70 (Ex. 71 at 90:24-92:12; Ex. 77 at 35:3-16).] *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1361-62 (Fed. Cir. 2004) ("[T]he law of inventorship does not hinge co-inventor status on whether a person contributed to the conception of all the limitations in any one claim of the patent. Rather, the law requires only that a co-inventor make a contribution to the conception of the subject matter of a claim."). Mr. Martin and Mr. Tillery are identified as inventors in the '981 application, which was filed on June 15, 1990 and to which the Arachnid patents-in-suit claim priority. [PSMF ¶ 69 (Ex.81).] Defendants have never asserted that Mr. Martin and Mr. Tillery are not the inventors of the subject matter of the '981 application, which undisputably includes basic subject matter that is encompassed within each of the Arachnid patents-in-suit. Therefore, at a minimum, Martin and Tillery are co-inventors that are legally required to be named inventors.

### b. There is no inequitable conduct as a matter of law based on an alleged unnamed inventor

Defendants allege that someone other than Messrs. Martin and Tillery conceived of some of the features of computer jukeboxes shown in Figures 2 through 5 of the Arachnid Patents, which was added in the continuation-in-part application filed in 1992. [PSMF ¶ 30 (Ex. 37 at 35-38; Ex. 38 at 40-43; Ex. 40 at 1-3).] Defendants then conclude that Arachnid committed inequitable conduct by not naming this unknown person as an inventor on the Arachnid Patents. [*Id.*] As an initial matter, it is not appropriate, when determining inventorship, to refer to features disclosed in figures or in the specification of a patent. Rather, when determining inventorship, what must be analyzed is the elements of the *claims*, which define the invention. *See In re Hiniker Co.*, 150 F.3d 1362 (Fed. Cir. 1998) ("[T]he name of the game is the claim."). Nonetheless, Plaintiffs here merely reiterate Defendants' allegations of inequitable conduct, with all their warts.

Defendants' assertion, even if properly alleged, fails as a matter of law for a very simple reason. The Federal Circuit has held that a "missing inventor" cannot amount to inequitable conduct where, as here, there is no person who claims that he or she should have been named as an inventor. *See, e.g., Pro-Mold and Tool Co.*, 75 F.3d at 1576 ("an error in determining inventorship is not by itself inequitable conduct"; "when an alleged omitted co-inventor does not claim to be such, it can hardly be inequitable conduct not to identify that person to the PTO as an inventor."); *see also Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027,

1037 (Fed. Cir. 2006) (no error finding no evidence of intent to deceive by not identifying an inventor where the inventor, at the time the application was filed, had indicated he was not an inventor). No one has come forward to claim inventorship [PSMF ¶ 68]; accordingly, Defendants' inequitable conduct allegation fails.

Even if Defendants' assertion were correct and an unnamed inventor exists, there is no evidence of any intent to deceive the PTO. [PSMF ¶ 71.] Once again, there is not an iota of evidence from the inventors that they intended to mislead the PTO when signing any patent declarations. And after deposing six Arachnid attorneys, there is no evidence that any attorney intended to mislead the PTO. Beyond failing to show any evidence of intent to deceive, Defendants have not provided any possible motive for Arachnid or its attorneys to mislead the USPTO about inventorship. *See Sanofi-Synthelabo*, 470 F.3d at 1381 (defendants' "generalized allegations" that the inventors' declaration excluded an inventor and that plaintiff was motivated to expand its patent monopoly "lack the particularity required to meet the threshold level of deceptive intent."). Moreover, the fact the deposition transcripts of Mr. Martin and Mr. Tillery were disclosed to the USPTO during prosecution of the '575 and '834 patents further demonstrates that Arachnid had nothing to hide and never intended to deceive the PTO about inventorship.[28] [PSMF ¶ 79 (Ex. 63; Ex. 69 at 3).]

Finally, the very nature of the allegation, and the evidence upon which Defendants rely, dictates that there cannot be any intent to deceive. Defendants are relying upon selective portions of the deposition testimony of Mr. Tillery and Mr. Martin from the *Touchtunes* litigation, given 7 years after the fact. According to Defendants, Mr. Tillery, referring to certain Figures in the '302 patent, testified that Figure 2 and the accompanying text was not his idea. Instead, Mr. Tillery thought (but was not even sure) that the source of Figure 2 and the text was an unnamed male associated with the patent attorneys. [PSMF ¶¶ 76 (Ex. 71 at 75-77).][29] But

---

[28] And, in fact, the USPTO issued the '575 and '834 patents despite having possession of and having reviewed the disclosed transcripts. [PSMF ¶ 79 (Exs. 2, 4).]

[29] Mr. Martin testified that he believed that Mr. Tillery had likely included certain information contained in the Figures, specifically song size data and transfer protocols. [PSMF ¶ 78 (Ex. 77 at 70, 74-75.] But like Tillery's testimony, other portions of Martin's testimony are ambiguous. Mr. Martin testified that he in fact does not rely on patent attorneys to add to his patent applications, but that he "rel[ies] on them to take my descriptions and to put them down in the legally proper form, and I review to make sure that everything that's said is accurate." [PSMF ¶ 75 (Ex. 77 at 67).]

31

when discussing the specific information contained in Figure 2, such as song size, music genre, song title and song address, etc., Mr. Tillery also testified that he and Mr. Martin had discussed information such as song titles, artists, genres and song identification. [PSMF ¶ 72 (Ex. 71 at 84-86).] He also testified that the other Figures, developed at the same time, involved his concepts. [PSMF ¶¶ 72-74, 77 (Ex. 71 at 30-31, 35, 42:1-42:23, 54-55, 84-86, 88-92, 95-96).] It is hardly surprising that inventor testimony, given 7 years after the fact, is ambiguous and even self contradictory.[30] The inventors, laymen to the world of patent law, were being asked to remember arcane details surrounding inventorship, a concept that the courts have called "one of the muddiest concepts in the muddy metaphysics of the patent law."[31] Such testimony can hardly be used to meet the heavy evidentiary burden of showing any intent to mislead the PTO.

The situation here is strikingly similar to *Solomon v. Kimberly-Clark*, 216 F.3d 1372, 1381-82 (Fed. Cir. 2000). In that case, like here, the inventor, at a deposition, could not describe the invention (or the prototype that had been built) with any precision. As a result, the *Kimberly-Clark* defendant, like the Defendants here, contended that the patent attorney was the true inventor and that it was inequitable conduct not to name the patent attorney as an inventor. Rejecting that inequitable conduct argument (as well as the underlying inventorship argument) as "misguided," the Federal Circuit explained that such inventor testimony was not sufficient. Rather, there would have to be "much stronger evidence that the named inventor was not the true inventor to justify a conclusion of clear and convincing evidence of invalidity." *Id.* at 1381. For similar reasons, Defendants' "missing inventor" claim is likewise "misguided."

### E.   CLAIMS 17 AND 19-21 OF THE '350 PATENT ARE INVALID

Currently, Ecast is only asserting claims 17, 19, 20 and 21 of the '350 patent in its infringement counterclaim.[32] Summary judgment, however, should be granted because Ecast has

---

[30] *See In the Matter of Sabec*, 137 B.R. 659, 670 (Bkrtcy. W.D Mich. 1992) ("The frailty of the human memory is well known and I would agree with those many judges who would more likely accept a written memorandum on a scrap of paper made at the time of a transaction than thousands of words of testimony adduced two years later.").

[31] *Jamesbury Corp. v. United States*, 518 F.2d 1384, 1396 (Ct. Cl. 1975).

[32] Previously, Ecast indicated that it was also intending to assert claims 1-7, 9, 10, 14, 16 and 20. Ecast has since indicated that it is no longer asserting these claims. [PSMF ¶¶ 22, 29 (Ex. 34; Ex. 28 at 12).] On the day before this motion was due, Ecast indicated that it was reasserting claim 20. [PSMF ¶ 22 (*See* Ex. 34).]

32

presented *absolutely no evidence* to refute the evidence presented by Rowe and AMI that these claims are invalid for anticipation and obviousness. In the Court-approved expert discovery schedule, each party was required to submit the initial expert reports on the issues where they bore the burden of proof. Since Rowe and AMI bear the burden of proof on invalidity of the '350 patent, they submitted the expert report of Dr. Bradley Dickinson September 4, 2007, explaining in detail the reasons why three separate prior art references rendered claims of the '350 patent invalid for anticipation and why combinations of these references rendered the claims invalid for obviousness.[33] [PSMF ¶ 22 (Ex. 16 at 114-32).] Responsive reports were due 30 days later. Rather than responding to this evidence, Ecast *consciously and deliberately chose not to submit expert testimony in response to Dr. Dickinson's report.* [PSMF ¶ 22 (Ex. 33 at 66-76).] Ecast did not contest that the identified references were indeed prior art. Likewise, Ecast did not contest these prior art references disclosed each and every limitations of claims 17, 19, 20 and 21 or that the combination of references renders the claims obvious.

Accordingly, the facts presented by Rowe and AMI that claims 17, 19, 20 and 21 are invalid are undisputed and summary judgment should be granted. Ecast's failure to withdraw this patent, in light of the request that it do so, can only be described as bad faith litigation. Ecast consciously chose not to submit *any evidence* contesting Dr. Dickinson's report. Having made that deliberate decision, the only responsible and legitimate action was to withdraw the claim. Its failure to do so constitutes bad faith and Ecast should be required to reimburse Rowe and AMI for the costs and attorneys fees expended on this aspect of the summary judgment motion.

On this basis alone, summary judgment should be granted. Should, however, the Court believe it necessary, we attach excerpts of Dr. Dickinson's report and the underlying prior art demonstrating the invalidity of these claims and briefly summarize that undisputed evidence.[34] [PSMF ¶¶ 22-28 (Ex. 16 at 114-32; Ex. 32; Ex. 35; Ex. 36).] The preamble of claims 17, 19, 20 and 21 identify some basic limitations of a computer jukebox system such as a

---

[33] A patent claim is invalid for anticipation where a single prior art reference discloses each limitation of the asserted claim. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed. Cir. 1998). A claim is obvious where one of ordinary skill in the art would find that the differences between the claim and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made." 35 U.S.C. § 103(a).

[34] Dr. Dickinson's report is consistent with the Northern District of California which, in connection with a motion for preliminary injunction in a prior case between Ecast and TouchTunes, ruled preliminarily that these claims of the '350 patent were likely invalid. [PSMF ¶ 22 (Ex. 27 at ROWE-0032445-47).]

DOCSNY-295674v01

data connection between a jukebox and a central location to allow the jukebox to receive audio communications, a jukebox including a digital to analog converter, an amplifier and audio transducer and an input unit to allow a jukebox use to make a selection. Dr. Dickinson demonstrated how three prior art references each included all of the limitations from the preamble. [PSMF ¶ 23 (Ex. 16 at 116-17, 119, 121-22).]

> Claim 17 includes the following additional limitation:

> The jukebox includes a mass storage memory for storing a plurality of musical selections that have been received from the central music store by way of the data communications line.

Dr. Dickinson demonstrated how each of the prior art references discloses this additional limitation: a jukebox memory that stored the music selections received from the central location. [PSMF ¶ 23 (Ex. 16 at 117, 120, 122).]

> Claim 19 depends from claim 17. Accordingly, this claim includes all the limitations of the independent claim 17 plus additional limitations. Here, the additional limitation of claim 19 is:

> Wherein the mass storage memory comprises a fixed disk

Once again, Dr. Dickinson explained how each of the prior art references discloses a mass storage memory that is a fixed disk. [PSMF ¶ 24 (Ex. 16 at 118, 120, 122).]

> Claim 20 depends from claim 17. Accordingly, this claim includes all the limitations of the independent claim 17 plus additional limitations. The additional limitations of claim 20 include a jukebox:

> Further comprising an intermediate memory for temporarily storing a musical selection which has been received from the central music store by way of the data communications line, and wherein the mass storage memory comprises a cache memory.

Dr. Dickinson again explained how prior art references disclose these limitations.[35] [PSMF ¶ 25 (Ex. 16 at 118, 120).][36]

---

[35] In addition, summary judgment of non-infringement of claim 20 should be granted. As explained above, Ecast has *never* submitted expert testimony showing infringement of claim 20. [PSMF ¶ 29 (Ex. 28 at 12).]

[36] Dr. Dickinson also explained that claim 20 was valid under 35 U.S.C. § 112 for failure to meet the written description and enablement requirements. [PSMF ¶ 28 (Ex. 16 at 131-132).] Ecast, of course, never responded to these invalidity contentions. Accordingly, summary judgment for § 112 invalidity should also be granted.

Claim 21 also depends from claim 17. The additional limitations of claim 21 include a jukebox:

> Further comprising an intermediate memory for temporarily storing a musical selection which has been received from the central music store by way of the data communications line, a payment unit and a computer which stores and processes user data.

Like the other claims, Dr. Dickinson explained exactly how prior art references disclose these additional limitations of claim 21. [PSMF ¶ 26 (Ex. 16 at 118-19, 122).] Finally, and once again uncontested by Ecast, Dr. Dickinson demonstrated why a combination of the references renders these claims obvious. [PSMF ¶ 27 (Ex. 16 at 123-27, 129-31).]

Since Defendants have never contested these undisputed facts, summary judgment of invalidity for anticipation and obviousness should be entered.

## IV.     CONCLUSION

For all the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

Dated: February 28, 2008

By:___/s/ James P. Murphy_____
James P. Murphy
David Z. Petty
McANDREWS HELD & MALLOY
500 West Madison Street, 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000

Attorneys for Plaintiff Arachnid, Inc. and
Local Counsel for Plaintiffs Rowe
International Corp. and AMI Entertainment,
Inc.

Respectfully submitted,

Charles W. Saber
Jon D. Grossman
DeAnna D. Allen
Dipu A. Doshi
Thomas D. Anderson
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

Dawn Rudenko Albert
DICKSTEIN SHAPIRO LLP
1177 Avenue of the America
New York, New York 10036

Attorneys for Plaintiffs Rowe International
Corp. and AMI Entertainment, Inc.

35

DOCSNY-295674

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2008, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS ROWE INTERNATIONAL CORP.'S AND ARCHNID, INC.'S AND COUNTERDEFENDANT AMI ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT** (*Public Redacted Version*) with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to the following, and the foregoing will also be served by email and Federal Express on the following:

Steven E. Feldman
WELSH & KATZ, LTD.
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
Phone: (312) 655-1500
SEFeldman@welshkatz.com

and

Ron C. Finley
Beck, Ross, Bismonte & Finley, LLP
50 W. San Fernando Street, Ste. 1300
San Jose, California 95113
rfinley@beckross.com

and

Charles W. Saber
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, D.C. 20006-5403
Phone: (202) 420-2200
SaberC@dicksteinshapiro.com

/s/ Violet Tovar